UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

OSTERHAUS PHARMACY, INC.,
CAMMACK'S PHARMACIES INC., DBA
JIM'S PHARMACY AND HOME HEALTH,
HARBOR DRUG CO., INC. and VALU
DRUGS INC., on behalf of themselves and all
others similarly situated,

             Plaintiff,

    v.

EXPRESS SCRIPTS, INC. and
EVERNORTH HEALTH, INC., formerly
known as Express Scripts Holding Company,

             Defendants.

NO.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

CLASS ACTION

      Plaintiffs Osterhaus Pharmacy, Inc. ("Osterhaus" or "Osterhaus Pharmacy"), Cammack's Pharmacies Inc., d/b/a Jim's Pharmacy and Home Health, ("Jim's" or "Jim's Pharmacy"), Harbor Drug Co., Inc., and Valu Drugs Inc. (collectively "Plaintiffs") bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23, against defendants Express Scripts, Inc. and Evernorth Health, Inc. (collectively "Express Scripts"). Express Scripts has entered into a series of price-fixing agreements (the "Agreements") with each of its co-conspirators, Prime Therapeutics LLC ("Prime"), Benecard Services, LLC ("Benecard"), and Magellan Rx Management, LLC ("Magellan") (Express Scripts' "Co-Conspirators," and, including Express Scripts, the "Conspirators").

      Plaintiffs seek treble damages, costs, attorneys' fees, and other monetary relief for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## I.      NATURE OF THE ACTION

1.      This civil antitrust action arises out of Defendant Express Scripts' horizontal conspiracies with each of three direct competitors to fix pharmaceutical reimbursement rates and related fees in violation of the Sherman Antitrust Act.

2.      Pharmacies play a crucial role in the American healthcare system by dispensing medications, counseling patients, reviewing prescriptions for safety and efficacy, compounding medications, and managing medication therapy.

3.      Approximately 92% of Americans have health insurance, including prescription drug coverage. To serve these patients, pharmacies must contract with the patient's pharmacy benefit manager, or "PBM," which in turn has contracted with the patient's health insurance plan to coordinate prescription drug benefits.

4.      A pharmacy must agree to a PBM's drug-reimbursement rates and its various fees to serve the PBM's patients.

5.      In recent years, the national PBM industry has become increasingly concentrated. PBMs have come under intense scrutiny for driving up the costs of prescription drugs across the United States. Today, just six PBMs control 95% of all prescriptions filled in the nation. The "Big Three" PBMs—Express Scripts, CVS Caremark, and OptumRx—control more than 80% of the prescriptions filled in the U.S. Each generates tens of billions of dollars in annual revenues.

6.      If pharmacies are to effectively serve their patients, they have little choice but to contract with each of the Big Three.

7.      Express Script is one of the two largest PBMs, managing pharmaceutical benefits for over 100 million health-plan members. Due to its size and control of access to many millions of patients who need their prescriptions filled, Express Scripts is able to use its market power to impose anti-competitive reimbursement rates and supracompetitive fees on pharmacies.

8.      PBMs without Express Scripts' market power—including its Co-Conspirators Prime, Benecard, and Magellan—ordinarily must offer more competitive reimbursement rates and fees to attract business from pharmacies.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

9.      However, Express Scripts has now entered into price-fixing Agreements with each of Prime, Benecard, and Magellan.

10.     These price-fixing Agreements enable Prime, Benecard, and Magellan to impose reimbursement rates and fees that are less favorable to pharmacies than they otherwise would be, matching Express Scripts' reimbursement rates and fees.

11.     Express Scripts regularly shares its confidential pricing information with its Co-Conspirators to ensure price parity and eliminate normal market forces.

12.     Express Scripts agreed with each of the smaller PBMs that, rather than competing for the business of pharmacy providers, each Co-Conspirator would lower its reimbursement rates and raise its fees to Express Scripts' levels. Each Co-Conspirator agreed to use the same price schedules as their competitor, Express Scripts.

13.     Through the unlawful Agreements with Express Scripts, each Co-Conspirator was able to reduce its reimbursement rates and raise its fees to the levels of the more powerful Express Scripts. In effect, the Co-Conspirators rented Express Scripts' market power.

14.     These blatant price-fixing Agreements have eliminated the normal market forces and have allowed the Co-Conspirators to enjoy excess revenues at the expense of pharmacies. Express Scripts demanded and receives a share of those revenues. For each pharmacy transaction that a Co-Conspirator processes using Express Scripts' reimbursement rates and fees, the Co-Conspirator pays compensation to Express Scripts. The Conspirators unlawfully extract supracompetitive revenue via the price-fixing Agreements. Express Scripts obtains a portion of these ill-gotten gains by, among other means, the per-transaction payments from its Co-Conspirators.

15.     The Agreements are naked restraints of trade. Except for the unlawful restraints in the Agreements, Express Scripts and its Co-Conspirators have not combined or integrated any meaningful assets or business functions. The only material change in the relationship between Express Scripts and each Co-Conspirator is that each Co-Conspirator's pharmacy reimbursement rates and fees are now set at Express Scripts' reimbursement rates and fees.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

16.     The Agreements are *per se* violations of § 1 of the Sherman Act. They also constitute Rule of Reason violations of § 1 because they unreasonably restrict competition by exercising market power on Co-Conspirator transactions to (1) deflate the rates at which the pharmacies are reimbursed for filling prescriptions and dispensing pharmaceuticals to health-plan members (hereinafter, "Reimbursement Rates"); and (2) inflate fees, including for (a) certain pharmaceutical claim-processing services ("Transaction Fees"); and (b) for so-called direct and indirect remuneration ("DIR") to provide services for patients whose plans contract with the Co-Conspirators ("DIR Fees") ("Transaction Fees" and/or "DIR Fees" are referred to hereinafter as "Fees").

## II.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

17.     Plaintiffs bring this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), to obtain damages from Express Scripts' ongoing violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

18.     This Court has personal jurisdiction over the defendants pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22.

19.     Venue is proper in this Court pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Express Scripts regularly transacts business within this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and Express Scripts resides in this district.

20.     The services at issue in this case are sold in interstate commerce. The unlawful activities alleged in this Complaint have occurred in, and have had substantial effect upon, interstate commerce in the United States.

## III.     PARTIES

21.     Plaintiff Osterhaus, formerly operated as Osterhaus Pharmacy and M&M Care, is a corporation that was organized under the laws of Iowa, and located at 918 W. Platt St. #2, Maquoketa, Iowa until January 1, 2022. In 1965, Bob and Ann Osterhaus purchased a family-

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

owned pharmacy in Maquoketa, a town of a few thousand residents in Northeast Iowa. Their son, Matt Osterhaus, began working at the pharmacy in 1983, and eventually operated it with his wife Marilyn Osterhaus. For his dedication, in 2005 Bob Osterhaus was awarded the Remington Medal, the highest recognition given in the pharmacy profession. The same year, Matt Osterhaus was awarded the Distinguished Achievement Award in Community Pharmacy Practice for his contributions to the conversion of the pharmacy into a pharmaceutical-care model of practice. Not only has Osterhaus Pharmacy served the community, but it also has trained the next generation of Iowa pharmacists. Beginning in 1995, Osterhaus Pharmacy served as a teaching site for Doctor of Pharmacy candidates, including from the University of Iowa, located around 90 miles away. In 1997, Osterhaus Pharmacy, another pharmacy, and the University of Iowa teamed up to offer a post-graduate residency program—the first community-based pharmacy residency in Iowa.

22. Plaintiff Cammack's Pharmacies Inc., d/b/a Jim's Pharmacy and Home Health, is a corporation organized under the laws of Washington with its principal place of business located at 424 East Second Street, Port Angeles, Washington. Jim's Pharmacy is a locally owned community pharmacy in Port Angeles, Washington, founded by husband-and-wife team Jim and Barb Cammack. The Cammacks opened the first location of Jim's Pharmacy in Port Angeles in 1983. After forty-two years of service as pharmacists, Jim and Barb retired in 2002 and their son, Joe Cammack, acquired Jim's Pharmacy. Currently, in addition to offering traditional pharmacy services, Jim's provides diabetic education to the community, adult and pediatric vaccinations, a "Free Vitamins for Kids" program offering free chewable vitamins to children ages 2 to 12, and a charitable giving program that has donated over $100,000 to local charities since 2008.

23. Plaintiff Harbor Drug Co., Inc. is a corporation organized under the laws of Washington, with its principal place of business located at 101 1st Ave S., Ilwaco, Washington. It is a locally owned community pharmacy.

CLASS ACTION COMPLAINT - 5
CASE NO.

1   24. Plaintiff Valu Drugs Inc. is a corporation organized under the laws of

2 Washington, with its principal place of business located at 201 Pioneer Ave., E., Montesano,

3 Washington. It is a locally owned community pharmacy.

4   25. Defendant Express Scripts, Inc. is a corporation organized under the laws of

5 Delaware, with its principal place of business located in St. Louis, Missouri. It is one of the two

6 largest PBMs in the country. Express Scripts, Inc. is a subsidiary of Defendant Evernorth Health,

7 Inc.

8   26. Defendant Evernorth Health, Inc. is a Delaware corporation with its principal

9 place of business located in St. Louis, Missouri. Evernorth Health, Inc. actively participates in

10 the unlawful conduct alleged herein by, among other things, shaping the company policies at

11 issue and participating in crafting, approving, and implementing the unlawful conduct. Evernorth

12 Health, Inc.'s annual reports over the past several years have repeatedly acknowledged its

13 control over its PBM subsidiaries, describing itself as "the largest independent PBM company in

14 the United States."

15   27. Co-Conspirator Prime, a Pharmacy Benefit Manager, is a limited liability

16 company organized under the laws of Delaware, with its principal place of business located in

17 Eagan, Minnesota. Prime manages pharmacy benefits for approximately 33 million people in the

18 United States.

19   28. Co-Conspirator Benecard, a Pharmacy Benefit Manager, is a limited liability

20 company organized under the laws of Delaware, with its principal place of business located in

21 Lawrenceville, New Jersey.

22   29. Co-Conspirator Magellan, a Pharmacy Benefit Manager, is a limited liability

23 company organized under the laws of Delaware, with its principal place of business located in

24 Eagan, Minnesota. Upon information and belief, Prime acquired Magellan in December 2022 for

25 approximately $1.35 billion, and Magellan continues in existence today.

26

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## IV.   **BACKGROUND**

30.     PBMs, such as Express Scripts, function as aggregators of market power in the distribution of prescription drugs. PBMs administer, on behalf of private and public health insurance plans, employers, governments, and plan sponsors, the acquisition of prescription drugs from pharmacies, such as the Plaintiffs, and negotiate the Reimbursement Rates and Fees for pharmacies for the drugs and services they provide to plan members. Plan sponsors hire PBMs to administer plans for prescription drug benefits provided to their members.

31.     PBMs were initially founded to process pharmaceutical claims for healthcare plans. In the late 1980s, PBMs began to create more significant "pharmacy benefit" services by developing a system for reimbursement of drug claims, claim processing, and drug dispensing control. PBMs contract with drug manufacturers and pharmacies to create these distribution, reimbursement, and claim-processing services. PBMs negotiate with drug manufacturers to have their drugs included in the PBMs' formularies, and they contract with pharmacies to distribute drugs and services to plan members subject to Reimbursement Rates and Fees negotiated by the PBMs.

32.     Reimbursement to pharmacies generates revenues for PBMs. Health plans own or hire PBMs to negotiate drug pricing with manufacturers, and to determine the amount pharmacies will be reimbursed for drugs. PBMs use a series of rebates and fees along the supply chain to charge health plans more for prescription drugs than the amount they reimburse pharmacies—often called the "spread." In other words, PBMs retain a portion of the payments they receive from health plans to reimburse pharmacies. That is the PBMs' spread.

33.     Market consolidation and vertical integration have transformed PBMs into entities with outsized market power and soaring profits. Today, just six PBMs control 95% of the prescriptions filled in the United States. The "Big Three" PBMs—Express Scripts, CVS Caremark, and OptumRx—control more than 80% of the prescriptions filled in the U.S., and each generates billions of dollars in annual revenues.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

34.     The trend toward vertical integration has magnified the Big Three PBMs' market power. Each of them is now affiliated with a dominant health insurer: Express Scripts (PBM) is affiliated with Cigna (health insurer); CVS Caremark (PBM) is affiliated with Aetna (health insurer); and OptumRx (PBM) is affiliated with United Healthcare (health insurer).

35.     The Big Three's market consolidation and vertical integration have given them control over access to large networks of customers (insured patients). Consequently, Plaintiffs and other pharmacies cannot realistically avoid doing business with the dominant PBMs, including Express Scripts. Doing so would deprive a pharmacy of access to the overwhelming majority of prescription drug transactions. If Plaintiffs or other pharmacies refused to do business with Express Scripts, patients whose plans use Express Scripts could not use their insurance to fill covered prescriptions at those pharmacies.

36.     Even before the anticompetitive Agreements with the Co-Conspirators, Express Scripts exerted significant leverage over pharmacies based on its substantial share of PBM-controlled prescriptions—up to 38%, depending on the metric—and its control over access to more than 100 million insured customers who purchase prescription drugs. Pharmacies must either bow to Express Scripts' aggregated demand and accept the Reimbursement Rates and Fees that Express Scripts imposes or effectively lose access to more than 100 million pharmacy patients.

## V.     ESI'S UNLAWFUL HORIZONTAL AGREEMENTS

37.     Express Scripts has entered into a series of anticompetitive Agreements with at least three direct competitor PBMs to fix their Reimbursement Rates and Fees for pharmacies.

38.     Express Scripts previously imposed Reimbursement Rates that were lower, and Fees that were higher, than the Co-Conspirators' Rates and Fees, giving the Co-Conspirators a competitive advantage in seeking business from pharmacies.

39.     Express Scripts then agreed that each of these smaller PBMs would rent Express Scripts' network. For those transactions, rather than allowing normal market forces to set prices, each Co-Conspirator would lower its Reimbursement Rates and raise its Fees to match those of

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Express Scripts. Each Co-Conspirator agreed to set its Reimbursement Rates and Fees based on Express Scripts' schedules.

40.     Express Scripts and each Co-Conspirator agreed that the Co-Conspirator's Reimbursement Rates and Fees on the relevant transactions would no longer be at the levels the Co-Conspirator negotiated on its own with pharmacies. Instead, the Co-Conspirator's Reimbursement Rates and Fees would be set at the amounts pharmacies are forced to accept from Express Scripts.

41.     Express Scripts, due to the large number of covered lives it represents, enjoys substantial market power in setting Reimbursement Rates and Fees. The Agreements allow the Co-Conspirators to effectively rent Express Scripts' substantial market power to impose lower Reimbursement Rates and higher Fees on Plaintiffs and the other pharmacies than they would otherwise accept.

42.     These price-fixing Agreements enabled the Co-Conspirators to obtain greater revenues from pharmacies than competition otherwise would allow. In exchange, Express Scripts received from the Co-Conspirators a share of those unlawfully high revenues. For each pharmacy transaction that a Co-Conspirator processes using Express Scripts' price and fee schedules, the Co-Conspirator pays a portion of its compensation to Express Scripts. In other words, Express Scripts and its Co-Conspirators use the Agreements to unlawfully extract revenues from pharmacies, which Express Scripts and each of the Co-Conspirators then share.

43.     Other than fixing prices, the Agreements do not provide for Express Scripts and each Co-Conspirator to undertake any joint commercial activity. The Agreements do not produce any efficiencies that could justify the unadorned price fixing. Express Scripts and each Co-Conspirator simply agree that the Co-Conspirator will impose Express Scripts' relatively low Reimbursement Rates and high Fees, and that the Co-Conspirator will pay a portion of its additional revenues to Express Scripts.

44.     The Agreements fix prices, pure and simple.

45.     The Agreements were formed as follows:

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**A.     The Express Scripts-Prime Agreement**

46.     Express Scripts and Prime entered into a three-year agreement (the "Express Scripts-Prime Agreement") to fix Reimbursement Rates and certain Fees. The Express Scripts-Prime Agreement, effective April 1, 2020 for private health plans and Medicaid, and January 1, 2021 for Medicare, provides that Prime's Reimbursement Rates and Fees are fixed at Express Scripts' Reimbursement Rates and Fees. Express Scripts and Prime subsequently extended their Agreement.

47.     Express Scripts and Prime both benefit from the lower Reimbursement Rates and higher Fees that Prime imposes on pharmacies by, in effect, renting Express Scripts' market power.

48.     As noted above, the Express Scripts-Prime Agreement provides a way for Express Scripts to participate in the supracompetitive revenues that Prime unlawfully extracts from pharmacies on Prime transactions. Pursuant to their unlawful Agreement, Prime compensates Express Scripts for each of those transactions.

49.     Aside from the Agreement to fix prices, Express Scripts and Prime continue to work independently with pharmacies. Prime has disavowed any intention of combining business functions with Express Scripts so as to potentially increase efficiency or economies of scale. Although Prime's Reimbursement Rates and Fees are established by the Express Scripts price schedule, Prime advised pharmacies on February 28, 2020 that Prime "will continue to process claims on behalf of our Benefit Sponsors." The only participation by Express Scripts in the process is to add an Express Scripts network identifier to the Prime computer system so that the Express Scripts Reimbursement Rates and Fees will be imposed on the Prime transactions.

50.     Prime has stated that it will continue to process all Prime claims, continue to handle its own billing and benefits management, and continue to perform all other PBM functions. Indeed, Prime stated in a January 2, 2020 press release that it "will continue to operate our claims processing platform as well as manage and deliver a wide range of services to our

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

clients and their members, including network management, formulary management, and clinical programs."

51.     Prime's CEO, Ken Paulus, confirmed these facts in a September 28, 2021 interview published in Managed Healthcare. Paulus acknowledged that, other than using Express Scripts prices, "we didn't really change anything at Prime... . We still process our own claims. We own the claim system. We do all our own Pas [prior authorizations], contact center, utilization management—we do everything ourselves... . So it's been a fairly elegant solution for us as a way to save significant dollars... but do so without giving up our strategic optionality, which is continuing to run our own business." Paulus concluded by stating, "we're basically still doing all the functions of the PBM except for the procurement."

**B.     The Express Scripts-Benecard Agreement**

52.     Express Scripts entered into a similar anticompetitive agreement with Benecard (the "Express Scripts-Benecard Agreement") to fix Reimbursement Rates and Fees for pharmacies, effective January 1, 2022. The Express Scripts-Benecard Agreement provides that Benecard's Reimbursement Rates and Fees are fixed at Express Scripts' Reimbursement Rates and Fees.

53.     As noted above, the Express Scripts-Benecard Agreement provides a way for Express Scripts to participate in the supracompetitive revenues that Benecard unlawfully extracts from pharmacies on Benecard transactions. Pursuant to their unlawful Agreement, Benecard compensates Express Scripts for each of those transactions.

54.     Aside from the agreement to fix prices, Express Scripts and Benecard continue to work independently with pharmacies.

**C.     The Express Scripts-Magellan Agreement**

55.     Express Scripts entered into another anticompetitive agreement with Magellan (the "Express Scripts-Magellan Agreement") to fix Reimbursement Rates and Fees for pharmacies effective April 1, 2023. The ESI-Magellan Agreement provides that Magellan's Reimbursement Rates and Fees are fixed at ESI's Reimbursement Rates and Fees.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

56.     As noted above, the Express Scripts-Magellan Agreement provides a way for Express Scripts to participate in the supracompetitive revenues that Magellan unlawfully extracts from pharmacies on Magellan transactions. Pursuant to their unlawful Agreement, Magellan compensates Express Scripts for each of those transactions.

57.     Aside from the agreement to fix prices, Express Scripts and Magellan continue to work independently with pharmacies. Upon information and belief, Express Scripts and Magellan have continued to operate under this framework and the Agreement following Prime's acquisition of Magellan in December 2022.

## VI.     ANTICOMPETITIVE EFFECTS

58.     Each Agreement between Express Scripts and a Co-Conspirator is a *per se* violation of § 1 of the Sherman Act. Each Agreement is also a Rule of Reason violation of § 1 because it unreasonably restricts competition by exercising market power to (1) suppress Reimbursement Rates, and (2) inflate Fees.

59.     Plaintiffs and the other class members are injured by this anticompetitive conduct. Each Agreement impairs free-market forces that otherwise would determine the Co-Conspirators' prices. As a result, class members, including Plaintiffs, receive lower Reimbursement Rates and pay higher Fees on transactions with each Co-Conspirator than they otherwise would.

60.     The unlawful Agreements also injure competition by reducing consumer choice, suppressing the output of pharmacy services, and decreasing the quality of pharmacy services, all without any offsetting procompetitive benefits. By obstructing the free-market forces that otherwise would determine Reimbursement Rates and Fees, the unlawful Agreements misallocate resources and suppress the supply of pharmacy services to the Co-Conspirators' health-plan members.

## VII.     MARKET POWER

61.     Express Scripts has market power over Plaintiffs and other class members.

CLASS ACTION COMPLAINT - 12
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

62.     Pharmacies generally cannot decline to deal with Express Scripts because of its control of access to over 100 million insured patients. That gives Express Scripts market power. Express Scripts, like other large PBMs, uses its market power to force pharmacies to accept lower Reimbursement Rates and higher Fees than the pharmacies otherwise would. The greater the number of plan members that a PBM represents, the greater its market power.

63.     Pharmacies must either bow to Express Scripts' demands on Reimbursement Rates and Fees, or effectively lose access to millions of plan members. Plaintiffs and other pharmacies have no realistic option other than to accept Express Scripts' terms because they cannot reasonably operate if they are cut off from such a large segment of potential customers.

64.     Moreover, pharmacy customers are locked into the insurance coverage that they have purchased. That includes both a healthcare plan and the PBM that has contracted with that plan. By the time a customer arrives at a pharmacy counter to obtain prescription drugs, the PBM that will process that transaction is set. The claim is processed through the PBM automatically. The pharmacy cannot seek better Reimbursement Rates or Fees from a different PBM. A pharmacy can refuse to contract with a PBM, but the predictable result is that the customers in that PBM's network will take their prescription drug business to other pharmacies.

65.     Express Scripts' market power is demonstrated by its imposing Reimbursement Rates that are below, and Fees that are above, competitive levels. Before the Co-Conspirators entered into the unlawful Agreements, their Reimbursement rates were greater, and their Fees were lower, than those of Express Scripts. The competitive level for Reimbursement Rates was at least as high, and for Fees was at least as low, as the rates charged by the Co-Conspirators before their entry into the unlawful Agreements.

66.     Moreover, and within the last five years, Express Scripts has reduced its Reimbursement Rates by more than 10%, and increased its Fees by more than 10%, without any basis in its relevant costs.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

67.     In addition, since at least the date of the unlawful Agreements, Express Scripts has enjoyed supracompetitive profits. Its market power over Plaintiffs and other class members is a principal source of those supracompetitive profits.

68.     Express Scripts' market power is further illustrated by its ability to impose onerous terms on pharmacies, including noncompetitive Reimbursement Rates and Fees.

69.     If it were necessary for Plaintiffs to establish market power indirectly, by defining a relevant market, the relevant market here is the market for access to fill PBM-covered patient prescriptions and for related services (the "PBM Network Market"), or narrower markets therein. A PBM with market power in the PBM Network Market can profitably deflate Reimbursement Rates to pharmacies below competitive levels and inflate Fees to pharmacies above competitive levels.

70.     Pharmacies generally must either accept the terms that Express Scripts imposes for transactions involving patients with health-care plans in its network or forgo reimbursement from the relevant plans. As a result, Express Scripts has much greater market power than its market share would ordinarily indicate.

71.     An automotive repair shop, for example, may be able to avoid paying inflated prices to a car-part manufacturer by purchasing parts from a rival manufacturer. It may lose few, if any, customers and sales by doing so.

72.     Pharmacies generally cannot similarly switch between PBMs to serve their customers. If a pharmacy declined to contract with Express Scripts, patients subject to the Express Scripts' network would be forced to forgo either using their insurance or using that pharmacy. Express Scripts thus has substantial market power in imposing deflated Reimbursement Rates and inflated Fees on pharmacies.

73.     The relevant geographic market is the United States, or narrower markets therein.

74.     Even before the anticompetitive Agreements described in this Complaint, Express Scripts enjoyed significant market power due to its substantial market share—up to 38%, depending on the metric—and its control over access to more than 100 million insured

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1   consumers who purchase prescription drugs.

2   75.   As a result of the Agreements, the Co-Conspirators can and do decrease their

3   Reimbursement Rates and increase their Fees to match Express Scripts' Reimbursement Rates

4   and Fees, essentially allowing the Co-Conspirators to rent Express Scripts' market power.

5   76.   Each of the unlawful Agreements augments Express Scripts' already substantial

6   market power, increasing its market share by adding the covered patients and the transactions of

7   the Co-Conspirators.

8   ## VIII.   CLASS ALLEGATIONS

9   77.   Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this

10  action on behalf of themselves and the following class (the "Class") of pharmacy services

11  providers, including but not limited to retail pharmacies, compounding pharmacies, and

12  physician dispensaries, but excluding mail order pharmacies ("Pharmacy Services Providers"):

13
14  > All Pharmacy Services Providers in the United States that directly received
    > reimbursement and/or paid fees for patient prescriptions and related pharmacy services
    > for any person or persons insured under any Co-Conspirator serviced plan during the
15  > period April 1, 2020 until the time of trial ("the Class Period") where such transactions
    > were subject to Express Scripts' reimbursement rates and/or fees.
16

17  78.   The Class consists of thousands of members that are geographically dispersed

18  across the United States so that joinder of all Class members is impracticable.

19  79.   Class members are readily identifiable from records and information maintained

20  by Express Scripts and its Co-Conspirators.

21  80.   Plaintiffs' claims are typical of the claims of the Class. Plaintiffs' interests are not

22  antagonistic to the claims of other Class members, and Plaintiffs have no material conflicts with

23  any other Class members that would make class certification inappropriate.

24  81.   Plaintiffs and all Class members were damaged by the same wrongful conduct of

25  Express Scripts arising from its unlawful agreements with its Co-Conspirators. On transactions

26  with the Co-Conspirators, Plaintiffs and all members of the Class were subject to (1) artificially

27  deflated Reimbursement Rates and (2) artificially inflated Fees.

CLASS ACTION COMPLAINT - 15
CASE NO.

1      82.     These harms arise out of and relate to the Co-Conspirators' Agreements with

2  Express Scripts in violation of the Sherman Act. They do not arise out of or relate to the

3  interpretation or performance of the pharmacies' contracts with Express Scripts. Plaintiffs do not

4  assert any claims (on behalf of themselves or the Class), and do not seek any damages, based on

5  transactions for which Express Scripts has been retained as the PBM for a health plan.

6      83.     Plaintiffs will fairly and adequately protect and represent the interests of all

7  members of the Class. Plaintiffs' interests are consistent with, and not antagonistic to, those of

8  the other Class members.

9      84.     Plaintiffs are represented by counsel who are experienced and competent in the

10 prosecution of class action litigation, particularly antitrust claims.

11     85.     Questions of law and fact common to the members of the Class predominate over

12 questions that may affect only individual Class members. These common questions include:

13              a.     Whether and to what extent Express Scripts, Prime, Benecard, and

14                     Magellan engaged in contracts, combinations, conspiracies or agreements

15                     to restrain competition, including by artificially deflating Reimbursement

16                     Rates and artificially inflating Fees, for Class members;

17              b.     The anticompetitive effects of the contracts, combinations, conspiracies or

18                     agreements during the Class Period;

19              c.     Whether Express Scripts' conduct caused anticompetitive Reimbursement

20                     Rates, Fees, or both;

21              d.     Whether, and to what extent, the conduct of Express Scripts and its Co-

22                     Conspirators caused antitrust injury to the Class; and

23              e.     Whether the contracts, combinations, conspiracies or agreements violated

24                     Section 1 of the Sherman Act, 15 U.S.C. § 1.

25     86.     These common questions do not vary among the Class members, so the Court and

26 the jury may resolve these issues without reference to the individual circumstances of any Class

27 members.

CLASS ACTION COMPLAINT - 16
CASE NO.

87.    Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all members of the Class. Such treatment will permit many similarly situated entities to prosecute their common claims in a single forum—simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

88.    The benefits of proceeding through the class mechanism, including providing all Class members a method for obtaining redress on claims that they could not practicably pursue individually, substantially outweigh any difficulties in the management of this litigation as a class action.

89.    Plaintiffs are not aware of any special difficulty to be encountered in the management of this action that would preclude maintaining it as a class action.

## IX.    CAUSES OF ACTION

### Claim 1: Violations of Section 1 of the Sherman Act
### (Express Scripts' Agreement with Co-Conspirator Prime)

90.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint as though fully set forth herein.

91.    Express Scripts and Prime, both PBMs, are direct business competitors that formed a horizontal Agreement to fix Reimbursement Rates and Fees for pharmacies on Prime transactions.

92.    That Express Scripts-Prime Agreement is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

93.    That Agreement also violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. The Agreement's intended and actual effect is to deflate the Reimbursement Rates below competitive levels and to inflate Fees above competitive levels.

94.    The Agreement misallocates economic resources by artificially deflating Reimbursement Rates and artificially inflating Fees for the Class members on Prime transactions.

CLASS ACTION COMPLAINT - 17
CASE NO.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

95.     The Agreement reduces consumer choice of pharmacies, the quality and convenience of pharmacy services, and the output of pharmacy services to consumers.

96.     The Agreement does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale and does not produce any procompetitive effects. Even if the Agreement had produced any such effects, they could easily be achieved by significantly less restrictive means than the horizontal aggregation of market power and the suppression of horizontal price competition, and any procompetitive effects are substantially outweighed by the Agreement's anticompetitive effects.

97.     Whether Express Scripts' conduct is judged under the *per se* rule or the Rule of Reason, the direct and proximate result of that unlawful conduct is that Plaintiffs and the Class have been injured by artificially deflated Reimbursement Rates and artificially inflated Fees on Prime transactions.

Claim 2: Violations of Section 1 of the Sherman Act
(Express Scripts' Agreement with Co-Conspirator Benecard)

98.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

99.     Express Scripts and Benecard, both PBMs, are direct business competitors that formed a horizontal Agreement to fix Reimbursement Rates and Fees for pharmacies on Benecard transactions.

100.    That Express Scripts-Benecard Agreement is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

101.    That Agreement also violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. The Agreement's intended and actual effect is to deflate Reimbursement Rates below competitive levels and to inflate Fees above competitive levels.

102.    The Agreement misallocates economic resources by artificially deflating Reimbursement Rates and artificially inflating Fees for the Class members on Benecard transactions.

CLASS ACTION COMPLAINT - 18
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

103.    The Agreement reduces consumer choice of pharmacies, the quality and convenience of pharmacy services, and the output of pharmacy services to consumers.

104.    The Agreement does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale and does not produce any procompetitive effects. Even if the Agreement had produced any such effects, they could easily be achieved by significantly less restrictive means than the horizontal aggregation of market power and the suppression of horizontal price competition, and any procompetitive effects are substantially outweighed by the Agreement's anticompetitive effects.

105.    Whether Express Scripts' conduct is judged under the *per se* rule or the Rule of Reason, the direct and proximate result of that unlawful conduct is that Plaintiffs and the Class have been injured by artificially deflated Reimbursement Rates and artificially inflated Fees on Benecard transactions.

Claim 3: Violations of Section 1 of the Sherman Act
(Express Scripts' Agreement with Co-Conspirator Magellan)

106.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

107.    Express Scripts and Magellan, both PBMs, are direct business competitors that formed a horizontal Agreement to fix Reimbursement Rates and Fees for pharmacies on Magellan transactions.

108.    That Express Scripts-Magellan Agreement is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

109.    That Agreement also violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason. The Agreement's intended and actual effect is to deflate Reimbursement Rates below competitive levels and to inflate Fees above competitive levels.

110.    The Agreement misallocates economic resources by artificially deflating Reimbursement Rates and artificially inflating Fees for the Class members on Magellan transactions.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

111.    The Agreement reduces consumer choice of pharmacies, the quality and convenience of pharmacy services, and the output of pharmacy services to consumers.

112.    The Agreement does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale and does not produce any procompetitive effects. Even if the Agreement had produced any such effects, they could easily be achieved by significantly less restrictive means than the horizontal aggregation of market power and the suppression of horizontal price competition, and any procompetitive effects are substantially outweighed by the Agreement's anticompetitive effects.

113.    Whether Express Scripts' conduct is judged under the *per se* rule or the Rule of Reason, the direct and proximate result of that unlawful conduct is that Plaintiffs and the Class have been injured by artificially deflated Reimbursement Rates and artificially inflated Fees on Magellan transactions.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and on behalf of all Class members and against Express Scripts, and that the Court enter an Order:

A.    Certifying the Class pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as Class counsel;

B.    Determining that Express Scripts has violated Section 1 of the Sherman Act on account of the acts alleged herein;

C.    Issuing judgment against Express Scripts for treble the damages sustained by Plaintiffs and members of the Class, as provided under Section 4 of the Clayton Act, on their transactions with each of the Co-Conspirators;

D.    Providing for pre-judgment and post-judgment interest, to the extent legally available, at the highest applicable legal rate;

E.    Ordering that Plaintiffs recover their costs of suit, including reasonable attorney's fees and costs as provided by Section 4 of the Clayton Act; and

F.    Granting such other and further relief as the Court deems just and proper.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## XI.   DEMAND FOR JURY TRIAL

CPursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 9th day of January, 2024.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell
    Beth E. Terrell, WSBA No. 26759
    Email: bterrell@terrellmarshall.com


By: /s/ Amanda M. Steiner
    Amanda M. Steiner, WSBA No. 29147
    Email: asteiner@terrellmarshall.com


By: /s/ Blythe H. Chandler
    Blythe H. Chandler, WSBA No. 43387
    Email: bchandler@terrellmarshall.com
    936 N. 34th Street, Suite 300
    Seattle, WA 98103-8869
    Telephone: (206) 816-6603

SPERLING & SLATER, LLC

Joseph M. Vanek *(pro hac vice forthcoming)*
Email: jvanek@sperling-law.com
Paul E. Slater *(pro hac vice forthcoming)*
Email: pes@sperling-law.com
Phil Cramer *(pro hac vice forthcoming)*
Email: pcramer@sperling-law.com
Trevor K. Scheetz *(pro hac vice forthcoming)*
Email: tscheetz@sperling-law.com
Kathryn M. DeLong *(pro hac vice forthcoming)*
Email: kdelong@sperling-law.com
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200

HILLIARD SHADOWEN LLP

Steve D. Shadowen *(pro hac vice forthcoming)*
Email: steve@hilliardshadowenlaw.com
Nicholas W. Shadowen *(pro hac vice forthcoming)*

CLASS ACTION COMPLAINT - 21
CASE NO.

1  Email: nshadowen@hilliardshadowenlaw.com
   Kathryn Allen *(pro hac vice forthcoming)*
2  Email: kallen@hilliardshadowenlaw.com
   1717 W. Sixth Street, Suite 370
3  Austin, TX 78703
   Telephone: (855) 344-3298
4
5  CUKER LAW FIRM
6  Mark R. Cuker *(pro hac vice forthcoming)*
   Email: mark@cukerlaw.com
7  575 Pinetown Rd
   P.O. Box 1151
8  Ft. Washington, PA 19034
   Telephone: (215) 531-8522
9
10  BERGER MONTAGUE PC
11  Joshua P. Davis *(pro hac vice forthcoming)*
    Email: jdavis@bm.net
12  Julie A. Pollock *(pro hac vice forthcoming)*
    Email: jpollock@bm.net
13  505 Montgomery Street, Suite 625
    San Francisco, CA 94111
14  Telephone (415) 906-0684
15
16  ROBERTS LAW FIRM US, PC
17  Michael L. Roberts *(pro hac vice forthcoming)*
    Email: mikeroberts@robertslawfirm.us
18  Erich P. Schork *(pro hac vice forthcoming)*
    Email: erichschork@robertslawfirm.us
19  Kelly Rinehart *(pro hac vice forthcoming)*
    Email: kellyrinehart@robertslawfirm.us
20  1920 McKinney Avenue, Suite 700
    Dallas, TX 75204
21  Telephone: (501) 821-5575
22
    *Attorneys for Plaintiffs and Proposed Class*
23
24
25
26
27

CLASS ACTION COMPLAINT - 22
CASE NO.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com