1

Hon. Richard A. Jones

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

10

OSTERHAUS PHARMACY, INC., et al.,

11

Plaintiffs,

Case No. 2:24-cv-00039-RAJ

12

v.

**DEFENDANTS' MOTION TO
TRANSFER OR IN THE
ALTERNATIVE
DISMISS OR STRIKE THE
COMPLAINT**

13

EXPRESS SCRIPTS, INC., et al.,

14

15

Defendants.

NOTING DATE: May 17, 2024

16

17

REQUEST FOR ORAL
ARGUMENT

18

19

20

21

22

23

24

25

26

27

1

2 **TABLE OF CONTENTS**

3 PRELIMINARY STATEMENT.........................................................................................1

4 BACKGROUND ...........................................................................................................2

5 A.    PBMs facilitate transactions between health plans and pharmacies. .......................2

6 B.    Express Scripts rents access to its network, which lowers prescription drug prices.
         ....................................................................................................................4

7 C.    Plaintiffs' contracts preclude claims in this forum and class actions. .....................5

8 ARGUMENT ...............................................................................................................7

9 I.    Plaintiffs' claims are subject to a forum-selection clause that requires transfer to
10       the Eastern District of Missouri. ...........................................................................7

11 II.   Plaintiffs' claims for class action relief are barred....................................................9

12 III.  Plaintiffs do not state a plausible claim for relief. .................................................10

13       A.    Plaintiffs do not plausibly allege an antitrust injury. ...................................11

14       B.    The network rental agreements are not unreasonable restraints of trade...12

15             1.    The network rental agreements are not unreasonable per se. ........13

16             2.    The network rental agreements do not violate the rule of reason. ..15

17                   a.    Plaintiffs allege facially implausible relevant
18                         markets….................................................................................16

19                   b.    Plaintiffs fail to allege indirect anticompetitive effects and
                           market power………………………………………………18

20
21                   c.    Plaintiffs do not plausibly allege direct evidence of
                           substantial anticompetitive effect………………………..19

22 IV.   Plaintiffs do not state a plausible claim for relief against Evernorth. .....................21

23 CONCLUSION...........................................................................................................22

24

25

26

27

Motion to Transfer, Dismiss, or Strike                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
(Case No. 2:24-cv-00039-RAJ) – i                                      1109 First Avenue, Suite 210
                                                                      Seattle, Washington 98101
                                                                         (206) 905-7000

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) .............................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................11, 18

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013)..................................................................................................7, 9

*Bearden v. Honeywell Int'l Inc.*,
2010 WL 1223936 (M.D. Tenn. Mar. 24, 2010) ..................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................11, 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)...............................................................................................11

*Camilo v. Uber Techs., Inc.*,
2018 WL 2464507 (S.D.N.Y. May 31, 2018) .......................................................10

*Carnival Cruise Lines, Inc. v. Shute*,
499 U.S. 585 (1991)................................................................................................9

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ................................................................................18

*Coronavirus Rep. v. Apple Inc.*,
2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ......................................................20

*Coronavirus Rep. v. Apple, Inc.*,
560 F. Supp. 3d 632 (D.N.H. 2021)......................................................................9

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .................................................................................15

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ..............................................................................5

*CVS Pharmacy, Inc. v. AstraZeneca Pharms. L.P.*,
2020 WL 4671659 (S.D.N.Y. Aug. 12, 2020) ......................................................9

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – ii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

*Docksider, Ltd. v. Sea Tech., Ltd.*,
875 F.2d 762 (9th Cir. 1989) ................................................................7

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................16

*In re EpiPen Direct Purchaser Litig.*,
2022 WL 1017770 (D. Minn. Apr. 5, 2022)..........................................22

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ..............................................................13

*Flaa v. Hollywood Foreign Press Ass'n*,
55 F.4th 680 (9th Cir. 2022) ..............................12, 13, 15, 16, 18, 19

*Hennessey v. Kohl's Corp.*,
571 F. Supp. 3d 1060 (E.D. Mo. 2021)..................................................9

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ............................................................19

*Intel Corp. v. Fortress Inv. Grp. LLC*,
2022 WL 16756365 (9th Cir. Nov. 8, 2022)...................15, 16, 18, 20, 21

*ISA Chi. Wholesale, Inc. v. Swisher Int'l, Inc.*,
2009 WL 3152785 (N.D. Ill. Sept. 25, 2009) .......................................9

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ..............................................................15

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ..............................................................5

*Lackie Drug Store, Inc. v. Arkansas CVS Pharmacy, LLC*,
2021 WL 5567360 (E.D. Ark. Nov. 29, 2021) .................................8, 10

*Lackie Drug Store, Inc. v. Arkansas CVS Pharmacy, LLC*,
2022 WL 16635130 (E.D. Ark. Nov. 2, 2022) ..................................8, 10

*Landers v. Quality Commc'ns, Inc.*,
771 F.3d 638 (9th Cir. 2014) ..............................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................18

*McIntosh v. Royal Caribbean Cruises, Ltd.*,
2018 WL 1732177 (S.D. Fla. Apr. 10, 2018) .......................................10

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – iii

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
  708 F.2d 1458 (9th Cir. 1983) ................................................................7, 10

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978)............................................................................13

*Niiranen v. Carrier One, Inc.*,
  2022 WL 103722 (N.D. Ill. Jan. 11, 2022)....................................................10

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)........................................................................13, 14

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)......................................................1, 12, 13, 16, 18, 20

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) ..................................................................19

*Paduano v. Express Scripts, Inc.*,
  55 F. Supp. 3d 400 (E.D.N.Y. 2014) .........................................................8, 10

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ..............................................................11, 18

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) ...............................................................13, 19

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  2017 WL 275398 (E.D. Pa. Jan. 18, 2017)......................................................13

*Pleasants v. Am. Express Co.*,
  541 F.3d 853 (8th Cir. 2008) ....................................................................9

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ..................................................................12

*Prudencio v. Midway Importing, Inc.*,
  831 F. App'x 808 (9th Cir. Oct. 26, 2020) .......................................................21

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...................................................................12

*Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc.*,
  399 F. Supp. 3d 1018 (C.D. Cal. 2019) ..........................................................19

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
  532 F.3d 963 (9th Cir. 2008) ...................................................................18

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – iv

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
    592 U.S. 80 (2020) ............................................................................................................3, 17

*Safe Health Sys., Inc. v. Chierchio*,
    2023 WL 6890754 (C.D. Cal. June 12, 2023) ...........................................................................8

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ..................................................................................................11

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ..................................................................................13, 14, 15, 20

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ...................................................................................................................13

*TigerGraph, Inc. v. Peak*,
    2020 WL 6161510 (N.D. Cal. Oct. 21, 2020) ..........................................................................8

*United States v. Bestfoods*,
    524 U.S. 51 (1998) .................................................................................................................21

*Water, Inc. v. Everpure, Inc.*,
    2008 WL 11338410 (C.D. Cal. Aug. 4, 2008) .........................................................................8

*whiteCryption Corp. v. Arxan Techs., Inc.*,
    2015 WL 3799585 (N.D. Cal. June 18, 2015) ........................................................................22

*Wholesale All., LLC v. Express Scripts, Inc.*,
    366 F. Supp. 3d 1069 (E.D. Mo. 2019) ..................................................................................13

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
    901 F.3d 1081 (9th Cir. 2018) .........................................................................................7, 9, 10

## Other Authorities

Fed. R. Civ. P. 12(b)(6)................................................................................................................10

Fed. R. Civ. P. 12(f)....................................................................................................................10

Fed. R. Civ. P. 23(c)(1)(A).........................................................................................................10

Fed. R. Civ. P. 23(d)(1)(D).........................................................................................................10

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application § 2012b (2023 ed.)........................................................14, 15

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – v

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

**PRELIMINARY STATEMENT**

Plaintiffs are a group of pharmacies that want this Court to end the network rental agreements of Defendant Express Scripts, Inc., so that the Plaintiff pharmacies can charge higher prices for prescription drugs, reaping additional profits at the expense of health plans and patients. That is the exact opposite of what the antitrust laws are meant to promote—competition that results in lower prices for consumers. That fundamental flaw in Plaintiffs' theory, along with numerous other defects in the Complaint, mandate dismissal or transfer of Plaintiffs' case.

*First*, Plaintiffs filed their claims in the wrong court. Plaintiffs' contracts with Express Scripts contain mandatory forum-selection clauses, which require their claims be litigated in the Eastern District of Missouri, not this Court.

*Second*, Plaintiffs contractually waived the ability to pursue class actions against Express Scripts. Accordingly, none of them can act as a class representative against Express Scripts and their class action allegations should be stricken.

*Third*, Plaintiffs' case should be dismissed because they have not alleged (and cannot allege) antitrust injury, which is a required element of every private antitrust case. To plead antitrust injury, a plaintiff must plausibly allege the challenged conduct has harmed competition—most commonly in the form of higher prices—and that the plaintiff in turn was injured by the reduction in competition. The Complaint does not make such a showing.

According to Plaintiffs' own allegations, pharmacy benefit managers (**PBMs**) like Express Scripts create networks that facilitate transactions between two different, but linked, groups: health plans (and their beneficiaries) on one side of the network and pharmacies on the other. In such a two-sided platform market, potential harm to competition must be determined with respect to the price paid for the transaction across the "market as a whole," accounting for both the price paid by consumers on one side of the network (health plans) and the prices paid on the opposite side (pharmacies). *Ohio v. Am. Express Co.*, 585 U.S. 529, 547 (2018). Plaintiffs have not pleaded any allegations about the impact of the challenged conduct on net prices across the two-sided market as a whole, so they have failed to plead harm to competition as a matter of law.

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

This pleading defect cannot be cured. Plaintiffs and other pharmacies belong to many PBM pharmacy networks, including those of Express Scripts, CVS Caremark, OptumRx, Prime, and Benecard. Plaintiffs allege that Express Scripts entered into agreements with Prime and Benecard that allowed health plan clients of those two smaller PBMs to access Express Scripts' pharmacy network. This, in turn, gave those clients access to the lower rates for prescription drugs that Express Scripts had negotiated with the Plaintiff pharmacies, instead of the higher rates negotiated by Prime and Benecard. Plaintiffs complain they were injured by this arrangement because Express Scripts' network reimburses pharmacies less for prescription drugs and charges higher fees to pharmacies than those negotiated by Prime and Benecard. But the allegation of lower drug prices on one side of the market—which undisputedly benefitted health plans and patients—and higher prices to pharmacies does not equate to higher prices across the two-sided market as a whole. As pleaded, it is equally plausible (indeed, it is more than plausible) that the health plans and patients on one side of the market benefitted more through lower prices than the pharmacies on the other side paid in higher fees. Thus, it is equally plausible that the effect of the challenged network rental agreements was a net price reduction across the two-sided market as a whole (or no price effect) and that the network rental actually increased competition (or did not impact competition at all).

*Fourth*, Plaintiffs fail to state a viable claim against Evernorth Health, Inc., the parent company of Express Scripts. As a matter of law, a parent company is not liable for the alleged conduct of its subsidiary, and Plaintiffs do not plausibly allege any conduct by Evernorth itself.

For these reasons, Express Scripts respectfully submits that the Complaint should be transferred or dismissed.

## BACKGROUND

**A.    PBMs facilitate transactions between health plans and pharmacies.**

Express Scripts is a PBM. First Amended Class Action Complaint, Dkt. No. 46 (**FAC**) ¶ 7. As the Supreme Court has explained:

> PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 2

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1

2

person's coverage and copayment information. After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM.

3

4

*Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83-84 (2020).

5

6

7

8

9

10

To provide these services, PBMs build "networks" of pharmacies. *See* FAC ¶¶ 3-4, 67, 72. A pharmacy network is a group of pharmacies that have contracted with the PBM to provide the PBM's clients (health plans and their members) with prescription drugs at contractually set, pre-negotiated rates. *See id.*; *see also Rutledge*, 592 U.S. at 84 ("PBMs' contracts with pharmacies typically set reimbursement rates according to a list specifying the maximum allowable cost (MAC) for each drug.").

11

12

13

14

15

16

17

18

19

20

21

22

PBMs provide various services to health plans. FAC ¶¶ 3, 33, 53-54. For example, PBMs negotiate reimbursement rates that the health plan will pay for prescription drugs. *Id.* ¶¶ 33-35; *see also Rutledge*, 592 U.S. at 84 ("[T]he amount that prescription-drug plans reimburse PBMs is a matter of contract between a given plan and a PBM."). By hiring a PBM, health plans can get access to the preset reimbursement rates the PBM has negotiated with pharmacies that participate in that PBM's network. *See* FAC ¶¶ 33-35. By aggregating the purchasing power of many health plans, PBMs are often able to negotiate lower rates from pharmacies than individual health plans could negotiate on their own. *See id.* ¶¶ 33-35, 39. PBMs also perform an array of related services for their health plan clients, like operating the claims processing platform for the client, maintaining a contact center, providing network management services, formulary management services, and utilization management services, as well as assisting with clinical programs. *Id.* ¶¶ 33-34, 53-54.

23

24

25

26

27

PBMs also sell services to the pharmacies that participate in their networks. *Id.* ¶¶ 4, 16. Specifically, PBMs process prescription claims, which requires assessing the patient's pharmacy benefits coverage and coordinating insurance coverage and reimbursement between the patient's health plan and the pharmacy. *See id.* ¶¶ 16, 67; *Rutledge*, 592 U.S. at 83-84. For these services, the PBM charges fees to a participating pharmacy. FAC ¶¶ 4, 16. These fees are a negotiated term

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 3

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

of the agreement that governs the pharmacy's participation in the PBM's networks, as are the reimbursement rates the pharmacy receives for prescriptions filled for the PBM's health plan clients and their members. *See id.* Thus, for every prescription drug transaction facilitated by a PBM, the PBM must simultaneously contract with and provide services to both a health plan and a pharmacy. *See id.* ¶¶ 3-4, 67.

Plaintiffs allege that pharmacies do not view PBM networks as substitutes. *See id.* ¶¶ 67, 75 ("Pharmacies generally cannot similarly switch between PBMs to serve their customers"). This is because a pharmacy would lose customers if it refused to participate in a PBM network used by that customer's health plan. *See id.* ¶¶ 38-39, 66-67, 75.

**B.    Express Scripts lowers prescription drug costs for patients by renting access to its pharmacy networks.**

Plaintiffs allege that, starting in 2020, Express Scripts began renting its pharmacy networks to smaller PBMs using network rental agreements. *Id.* ¶¶ 42, 49. It first entered into a network rental agreement with Prime. *Id.* ¶ 49. Prime covers approximately one third as many health plan members as Express Scripts. *See id.* ¶¶ 30, 39. Then, in 2022, it entered into a network rental agreement with Benecard. *Id.* ¶ 55. Benecard is "smaller" than Express Scripts. *Id.* ¶ 42.

The Complaint alleges that larger PBMs negotiate better rates and fees than smaller PBMs. *See id.* ¶¶ 65, 68. Large PBMs have more plan members, and thus more volume to offer to pharmacies, so pharmacies are willing to offer lower rates and higher fees to larger PBMs. *See id.* ¶¶ 65–67. There are at least six large PBM providers in the United States, including CVS Caremark and OptumRx. *Id.* ¶ 5. According to Plaintiffs, Express Scripts accounts for—at most—38% of PBM-controlled prescriptions. *Id.* ¶ 39. Express Scripts gets lower rates and higher fees from pharmacies that wish to participate in its larger network than the smaller PBMs get from pharmacies for participation in their smaller networks. *Id.* ¶¶ 65, 68.

Under the network rental agreements, Express Scripts provides Prime and Benecard access to its existing pharmacy network. *Id.* ¶¶ 42-43. When the smaller PBMs and their health plan clients use Express Scripts' pharmacy network to complete a prescription drug purchase, the

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 4

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

prescription drug transaction is processed according to the rates and fees Express Scripts independently negotiated with that pharmacy for participation in its network. *Id.* As a result, the smaller PBM's clients obtain access to the lower reimbursement rates available through Express Scripts' network. *Id.* As Prime's CEO described it, this collaboration provides "a fairly elegant solution" to "save significant dollars." *Id.* ¶ 54. In fact, he explained, "It's been hugely successful. [It has resulted in] literally the ***billions of dollars of savings for our clients*** that we wouldn't have otherwise seen." Ex. A Part 3 (emphasis added).[1]

### C. Plaintiffs' Pharmacy Provider Agreements with Express Scripts bar claims in this forum and class actions.

Plaintiffs are pharmacies that entered into agreements with Express Scripts to participate in its pharmacy network (**Pharmacy Provider Agreements**).[2] Specifically:

- Exhibit B is an excerpt of Express Scripts' operative Agreement with Osterhaus Pharmacy, Inc.;

- Exhibit C is an excerpt of Express Scripts' operative Agreement with Cammack's Pharmacies, Inc., d/b/a Jim's Pharmacy and Home Health;

- Exhibit D is an excerpt of Express Scripts' operative Agreement[3] with Harbor Drug Co., Inc.;

- Exhibit E is an excerpt of Express Scripts' operative Agreement with Valu Drugs Inc.;

- Exhibit F is an excerpt of Express Scripts' operative Agreement with Smith's Pharmacy II, Inc., d/b/a Smith's Pharmacy;

---

[1] Exhibit A is the full interview quoted in paragraph 54 of the FAC. It is therefore incorporated by reference into the Complaint. *See, e.g., Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[2] These Agreements are incorporated in the Complaint by reference. *See* FAC ¶¶ 45-46; *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (contract incorporated by reference where plaintiff alleges relationship implicating the agreement).

[3] The contract is with an entity named Ilwaco Pharmacy, which operates at the same address as Plaintiff Harbor Drug Company, "101 1st Ave S., Ilwaco, Washington." FAC ¶ 23. On information and belief, this contract governs the relationship with Plaintiff Harbor Drug Co.

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 5

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

- Exhibit G is an excerpt of Express Scripts' operative Agreement with Old Baltimore Pike Apothecary, Inc., t/a Southern Chester County Pharmacy;

- Exhibit H is an excerpt of Express Scripts' operative Agreement[4] with Redner's Markets, Inc.

Each of these Agreements with Express Scripts includes a nearly identical "Dispute Resolution" provision. Exs. B-H § 7.12. Each Dispute Resolution provision contains both (1) a forum-selection clause and (2) a class-action waiver. For example, the Dispute Resolution provision of Osterhaus Pharmacy's Agreement states:

> [P]rior to either party pursuing any legal action in connection with this Agreement, both parties agree to meet in good faith to resolve any claim or controversy ("Claim") . . . arising from or relating in any way to the interpretation or performance of this agreement. The aggrieved party shall notify the other party of its Claim providing sufficient detail to permit the other party to respond. The parties agree to meet and confer in good faith to resolve any Claims that may arise under this Agreement for a period of not less than thirty (30) days . . . .

> All litigation between the parties arising out of or related in any way to the interpretation or performance of the Agreement shall be litigated in the U.S. District Court for the Eastern District of Missouri . . . .

> The parties agree that Claims shall not be consolidated or coordinated in any action with the Claim of any other individual or entity. No Claim or other dispute may be litigated on a coordinated, class, mass, or consolidated basis.

Ex. B § 7.12.

---

[4] Plaintiff Redner's Markets, Inc. (d/b/a Redner's Pharmacy) participates in Express Scripts' pharmacy network as part of a pharmacy services administrative organization (**PSAO**), Health Mart Altas, LLC (f/k/a AccessHealth). Exhibit H is an excerpt of the operative PSAO Services Agreement between Express Scripts and Health Mart Atlas, LLC (f/k/a AccessHealth), dated June 8, 2018. Exhibit I is Express Scripts' Letter of Intent with AccessHealth, dated March 30, 2018, noting AccessHealth was changing its name to Health Mart Atlas, LLC, effective April 1, 2018. Exhibit J is a PSAO Pharmacy Affiliation Authorization signed on behalf of Redner's Pharmacy # 38 to participate in the AccessHealth PSAO with Express Scripts, dated February 10, 2018.

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 6

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1

**ARGUMENT**

2    I.    **Plaintiffs' claims are subject to a forum-selection clause that requires transfer to the**
3          **Eastern District of Missouri.**

4          "When the parties have agreed to a valid forum-selection clause, a district court should

5    ordinarily transfer the case to the forum specified in that clause." *Atl. Marine Const. Co. v. U.S.*

6    *Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). Plaintiffs' claims here are covered by the

7    forum-selection clauses in their Pharmacy Provider Agreements, so their claims must be

8    transferred to the Eastern District of Missouri. *See Yei A. Sun v. Advanced China Healthcare, Inc.*,

9    901 F.3d 1081, 1086 (9th Cir. 2018); *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d

10   1458, 1464 (9th Cir. 1983).

11         Plaintiffs' Pharmacy Provider Agreements with Express Scripts contain broad and

12   mandatory forum-selection clauses. Each Plaintiff participated in Express Scripts' pharmacy

13   networks under its respective Pharmacy Provider Agreement. *See generally* Exs. B-H. Each

14   Pharmacy Provider Agreement contains a forum-selection clause in § 7.12 that provides: "All

15   litigation between the parties arising out of or related in any way to the interpretation or

16   performance of the Agreement shall be litigated in the U.S. District Court for the Eastern District

17   of Missouri." Exs. B-H § 7.12. Thus, each "[P]laintiff agree[d] by contract to bring suit only in a

18   specified forum," namely the Eastern District of Missouri. *Atl. Marine*, 571 U.S. at 63. These

19   forum-selection clauses are mandatory. *See Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 763-

20   64 (9th Cir. 1989). The forum-selection clauses are also broad, covering "any disputes that

21   reference the agreement or have some logical or causal connection to the agreement." *See Yei A.*

22   *Sun*, 901 F.3d at 1086 (quotation marks omitted).

23         Plaintiffs' claims are premised on Plaintiffs' participation in Express Scripts' pharmacy

24   network and the payments they received pursuant to the reimbursement rates and transaction fees

25   set out in their respective Agreements with Express Scripts. *See, e.g.*, FAC ¶ 15 ("reimbursement

26   rates and fees are now at Express Scripts' reimbursement rates and fees."); *id.* ¶ 45 (the smaller

27   PBMs are "using Express Scripts' price and fee schedules"); *id.* ¶ 49 (rates and fees "are fixed at

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 7

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

Express Scripts' Reimbursement Rates and Fees"); *id.* ¶ 52 ("Reimbursement Rates and Fees are established by the Express Scripts price schedule . . . . Express Scripts Reimbursement Rates and Fees will be imposed on the Prime transactions."). Those transaction fees and reimbursement rates are governed by the Pharmacy Provider Agreements. Exs. B-H § 3.1.a.-b. The claims in the Complaint are therefore disputes that arise out of or relate to the Pharmacy Provider Agreements. *See Safe Health Sys., Inc. v. Chierchio*, 2023 WL 6890754, at *3 (C.D. Cal. June 12, 2023) (disputes resulting from performance of an agreement relate to the agreement); *TigerGraph, Inc. v. Peak*, 2020 WL 6161510, at *5 (N.D. Cal. Oct. 21, 2020) (a dispute that "implicates the . . . compensation terms provided for in the . . . agreement" relates to the agreement); *Water, Inc. v. Everpure, Inc.*, No. CV-08-218, 2008 WL 11338410, at *3 (C.D. Cal. Aug. 4, 2008) ("Plaintiff's claims relate in some way to rights and duties enumerated in the Agreement. These claims are therefore within the scope of the forum-selection clause.") (cleaned up).

Multiple courts have held in similar cases that the same or similar language in Express Scripts' contracts with pharmacies requires transfer. One district court addressed claims brought by an independent pharmacy alleging that Express Scripts participated in "anticompetitive" practices, including allegedly underpaying plaintiff pharmacies. *See Lackie Drug Store, Inc. v. Arkansas CVS Pharmacy, LLC*, 2021 WL 5567360, at *1 (E.D. Ark. Nov. 29, 2021). That district court held that those claims arose from Express Scripts' contracts with the plaintiff pharmacy and enforced an identical forum-selection clause in that plaintiff's Pharmacy Provider Agreement, transferring those claims to the Eastern District of Missouri. *Lackie Drug Store, Inc. v. Arkansas CVS Pharmacy, LLC*, 2022 WL 16635130, at *2 (E.D. Ark. Nov. 2, 2022). Another district court reached the same conclusion in assessing the applicability of Express Scripts' forum-selection clause to antitrust claims brought by different pharmacies. *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 433 (E.D.N.Y. 2014) ("where, as here, '[w]hen 'arising out of,' 'relating to,' or similar language appears in a forum selection clause, 'such language is regularly construed to encompass securities, antitrust, and tort claims associated with the underlying contract'") (citation omitted; alterations in original). Similar examples of courts enforcing forum-selection clauses on

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 8

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1    antitrust claims abound. *See, e.g.*, *Coronavirus Rep. v. Apple, Inc.*, 560 F. Supp. 3d 632, 640-41

2    (D.N.H. 2021) (forum-selection clause required transfer of antitrust conspiracy and

3    monopolization claims); *CVS Pharmacy, Inc. v. AstraZeneca Pharms. L.P.*, 2020 WL 4671659, at

4    *4-5 (S.D.N.Y. Aug. 12, 2020) (forum-selection clause required transfer of antitrust conspiracy

5    claims); *ISA Chi. Wholesale, Inc. v. Swisher Int'l, Inc.*, 2009 WL 3152785, at *5 (N.D. Ill. Sept.

6    25, 2009) (forum-selection clause required dismissal of antitrust claims under the Robinson-

7    Patman Price Discrimination Act).

8           Transfer is in the public interest. While the court must consider whether transfer is in the

9    interest of justice, this review is limited to "public-interest factors only" and mandatory "forum-

10   selection clauses should control except in unusual cases." *Atl. Marine*, 571 U.S. at 64. This is not

11   an unusual case. The parties freely entered into the Pharmacy Provider Agreements, and

12   Washington has no unique interest in the law of the case or the nationwide facts alleged in the

13   Complaint. Moreover, no public policy basis exists to invalidate the agreements. *See Carnival*

14   *Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-95 (1991) (public policy generally supports

15   application of forum-selection clauses in commercial contracts). "Because [Plaintiffs'] dispute is

16   logically connected to the parties' agreements, it is subject to the forum-selection clause." *Yei A.*

17   *Sun*, 901 F.3d at 1087.

18   **II.    Plaintiffs' class action claims are barred.**

19          The Court should also strike Plaintiffs' class action allegations, including such allegations

20   in paragraphs 80-92, 97, 100, 105, 108, 113, 116, and X.A of the FAC. Each Plaintiff waived its

21   rights to class relief in its Pharmacy Provider Agreement with Express Scripts. The Agreements

22   are governed by Missouri law. Exs. B-H § 7.8. Under Missouri law, such class action waivers must

23   be enforced. *See Pleasants v. Am. Express Co.*, 541 F.3d 853, 857, 859 (8th Cir. 2008); *Hennessey*

24   *v. Kohl's Corp.*, 571 F. Supp. 3d 1060, 1071, 1073-75 (E.D. Mo. 2021).

25          Each Pharmacy Provider Agreement contains a class-action waiver in § 7.12 that provides:

26   "[A]ny claim or controversy ("Claim") . . . arising from or relating in any way to the interpretation

27   or performance of this Agreement . . . shall not be consolidated or coordinated in any action with

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 9

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1    the Claim of any other individual or entity" and "[n]o Claim or other dispute may be litigated on

2    a coordinated, class, mass, or consolidated basis." Exs. B-H § 7.12. As described above and

3    throughout Plaintiffs' complaint, the reimbursement rates, transaction fees, and performance of

4    Plaintiffs' contracts with Express Scripts form the basis for the alleged antitrust violations. *See,*

5    *e.g.*, FAC ¶¶ 7-9, 14-15, 42-43. Plaintiffs' claims therefore "arise out of" and "relate" to the

6    Pharmacy Provider Agreements. *See Yei A. Sun*, 901 F.3d at 1086; *Mediterranean Enters.*, 708

7    F.2d at 1464.; *see also, e.g.*, *Lackie*, 2022 WL 16635130, at *2 (finding similar antitrust claims

8    were covered by the same language as the Dispute Resolution provisions here);[5] *Paduano*, 55 F.

9    Supp. 3d at 432-34 (antitrust claims covered by same language).

10          District courts routinely strike or dismiss class allegations when a plaintiff's contract with

11    a defendant contains a class-action waiver. *See, e.g., Niiranen v. Carrier One, Inc.*, 2022 WL

12    103722, at *1, *8-9 (N.D. Ill. Jan. 11, 2022) (dismissing class allegations under 12(b)(6) based on

13    valid class action waiver); *Camilo v. Uber Techs., Inc.*, 2018 WL 2464507, at *3 (S.D.N.Y. May

14    31, 2018) (striking class allegations because of class action waiver); *McIntosh v. Royal Caribbean

15    Cruises, Ltd.*, 2018 WL 1732177, at *1, *3 (S.D. Fla. Apr. 10, 2018) (dismissing complaint under

16    Rule 12(b)(6) because of enforceable class action waiver); *see also Bearden v. Honeywell Int'l

17    Inc.*, 2010 WL 1223936, at *9 (M.D. Tenn. Mar. 24, 2010) ("noting, in case striking allegations

18    because class-wide adjudication was inappropriate, that "[u]nder Rules 23(c)(1)(A) and

19    23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations

20    prior to discovery if the complaint demonstrates that a class action cannot be maintained.").

21    Plaintiffs' class action claims should similarly be stricken or dismissed.

22    **III.    Plaintiffs do not state a plausible claim for relief.**

23          Plaintiffs' Complaint must also be dismissed in its entirety because it does not state a

24    plausible claim for relief under the antitrust laws. Federal Rule of Civil Procedure 12(b)(6) requires

25

26    _____
      [5] The District Court's prior opinion in *Lackie* sets out the substance of the plaintiff's similar
27    antitrust claims. *See Lackie*, 2021 WL 5567360, at *1-2.

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 10

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

a complaint be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "requires more than labels and conclusions." *Id.* at 555. "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* The factual allegations must "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The importance of stating a plausible claim for relief is particularly pronounced "before permitting a case to proceed into costly and protracted discovery in an antitrust case" involving class action claims. *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013) (citing *Twombly*, 550 U.S. at 557-59).

### A.    Plaintiffs do not plausibly allege an antitrust injury.

To survive a motion to dismiss, a complaint must plead "sufficient facts to state a plausible antitrust injury." *Somers*, 729 F.3d at 963. An antitrust injury is an injury caused by a reduction in competition. *Id.* But, "[w]here the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Id.* at 967 (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)). Similarly, injuries incurred by a plaintiff as a result of increased competition cannot be used to show antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Failure to allege a plausible antitrust injury requires dismissal. *Somers*, 729 F.3d at 966.

The Complaint does not plausibly allege antitrust injury because the network rental agreements, as alleged, do not reduce competition. The factual allegations of the Complaint also reveal how the network rental agreements actually ***increased*** PBM competition, which reduced prices to the benefit of consumers. Specifically, when the smaller PBMs began offering their services on top of Express Scripts' larger pharmacy network, this created a new, competitive PBM option, offering lower drug prices than those available through smaller PBM networks. Consumers (health plans and members) in turn can choose this new PBM option over competing alternatives.

Plaintiffs' alleged injury stems from increased PBM competition. For example, consider Plaintiffs' allegation that they profited less due to the lower rates and higher fees Prime offered when it used Express Scripts' network. FAC ¶ 97. Today, if insurers want to use Prime's claims

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 11

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

processing services on Prime's pharmacy network (Option 1), they can. *Id.* ¶¶ 52-54, 57. There is no allegation that Prime ceased offering its own pharmacy network to health plans. When insurers select this option, Plaintiffs are no worse off than they were before the network rental agreement. If insurers want to use Express Scripts' pharmacy network alongside its claims processing services (Option 2), they can. *Id.* ¶¶ 52-54, 57. When insurers select this option, Plaintiffs are no worse off than they were before the network rental agreement. Further, insurers can still choose to switch to any of the other large competing PBMs, like CVS Caremark and OptumRx, which continue to offer their own competing pharmacy networks and claims processing services (Option 3). *Id.* ¶ 5. When insurers select any one of those competitors, Plaintiffs are no worse off than they were before the network rental agreement. The only time Plaintiffs make less money as a result of Prime's network rental agreement with Express Scripts is when an insurer elects to forgo these pre-existing PBM options and instead chooses the new combination of Prime's PBM services on Express Scripts' pharmacy network (Option 4), which admittedly allows Prime's customers to secure "lower Reimbursement Rates"—*i.e.*, to pay lower prices for prescription drugs. *Id.* ¶ 44.

Plaintiffs' "damages" therefore flow from consumers getting a new PBM option, not from reduced PBM competition. But "reduced profits from lower prices . . . is not the type of harm" the antitrust laws are "meant to protect against." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001). Rather, "[i]t is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). And "[i]njury that flows from aspects of the defendant's conduct that are beneficial or neutral to competition . . . is no antitrust injury." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). "[I]t is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Id.*

**B.  The network rental agreements are not unreasonable restraints of trade.**

Section 1 of the Sherman Act prohibits "unreasonable" restraints of trade. *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022) (citing *Am. Express*, 585 U.S. at 540-41). "A restraint can be unreasonable in two different ways. 'A small group of restraints are

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 12

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1  unreasonable per se because they always or almost always tend to restrict competition and decrease

2  output.'" *Id.* (quoting *Am. Express*, 585 U.S. at 540). Courts must assess "all other restraints under

3  the 'rule of reason.'" *Id.* And "the Court 'presumptively applies rule of reason analysis.'" *Id.*

4  (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).

5  **1.     The network rental agreements are not unreasonable per se.**

6      As a matter of law, the network rental agreements at issue here cannot be unreasonable per

7  se. "Per se liability is reserved for only those agreements that are 'so plainly anticompetitive that

8  no elaborate study of the industry is needed to establish their illegality.'" *Dagher*, 547 U.S. at 5

9  (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). PBMs and

10  network rental agreements, however, are effectively purchasing cooperatives, which must be

11  assessed under the rule of reason. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing

12  Co.*, 472 U.S. 284, 295-98 (1985); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of

13  R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).

14      "PBMs are effectively purchasing cooperatives" that wield "health plans' aggregate

15  purchasing power to gain greater discounts than the health plans could obtain individually." *In re

16  EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 966

17  (10th Cir. 2022). Courts have repeatedly recognized that PBMs provide benefits to consumers by

18  negotiating drug purchases collectively to increase efficiency and lower costs. *See, e.g.*, *Wholesale

19  All., LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1073, 1080 (E.D. Mo. 2019) (noting that

20  "PBMs such as Express Scripts create pharmacy networks through which their clients' members

21  may obtain prescription drugs at covered, discounted rates" and dismissing a complaint alleging

22  that Express Scripts' "low" reimbursement rates and administrative "fees" to pharmacies

23  constituted an antitrust violation); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d

24  505, 511 (8th Cir. 2018) ("PBMs create networks of pharmacies in which PBM members can

25  receive their prescription pharmaceuticals at covered, discounted rates."); *In re Pharmacy Benefit

26  Managers Antitrust Litig.*, 2017 WL 275398, at *4 (E.D. Pa. Jan. 18, 2017) ("PBM administration

27  of prescription drug benefit programs achieves a number of efficiencies.").

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 13

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1    The Supreme Court has held that such purchasing cooperatives "are not a form of concerted

2    activity characteristically likely to result in predominantly anticompetitive effects." *Nw. Wholesale*

3    *Stationers*, 472 U.S. at 295-98. "Rather, such cooperative arrangements would seem to be designed

4    to increase economic efficiency and render markets more, rather than less, competitive." *Id.*; *see*

5    *also Stop & Shop*, 373 F.3d at 64 ("the Supreme Court has flatly rejected the per se label for those

6    [joint ventures] that have some efficiency achieving benefits.").[6] Indeed, the materials cited by the

7    Complaint confirm the procompetitive effects of PBMs in general and the network rental

8    agreements at issue. *See, e.g.*, Ex. A Part 1, Part 3 (PBMs in general have resulted in "billions and

9    billions of dollars of savings" on healthcare services; Prime's collaboration with Express Scripts

10   has resulted in "billions of dollars of savings" for Prime's health plan clients).

11   The Complaint confuses these classic pro-competitive benefits of a purchasing cooperative

12   with anticompetitive "market power." *See, e.g.*, FAC ¶¶ 33, 75-79 (describing how PBMs and

13   Express Scripts secure lower prices by jointly negotiating on behalf of health plans' customers and

14   calling this "market power"). But as the seminal antitrust treatise by Professors Areeda and

15   Hovenkamp explains, joint purchasing can create "'buying power' equal to that of larger firms,"

16   but "that term does not necessarily suggest market power in the economic sense of forcing sellers

17   to accept less than the competitive price, thus producing less." Phillip E. Areeda & Herbert

18   Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 2012b

19   (2023 ed.) ("Areeda"). Rather, "'buying power' in this context usually means merely that by

20   purchasing in large lots the cooperative can obtain terms that are as attractive as those offered to

21   very large buyers." *Id.* That is exactly what the Complaint alleges here. *See, e.g.*, FAC ¶¶ 13, 44

22   (the network rental agreements give the smaller PBMs access to the more favorable pricing of the

23   larger PBM, Express Scripts).

24

25   _____

26   [6] *Northwest Wholesale* left open the possibility that the per se rule could potentially apply in cases where the purchasing cooperative has "market power or exclusive access to an element essential to effective competition." *Nw. Wholesale Stationers*, 472 U.S. at 296. The Complaint does not

27   plausibly allege those circumstances exist here. *See* Section III.B.2.c, below.

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 14

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

Plaintiffs' incendiary allegations of "price-fixing" are similarly based on an incorrect understanding of law. *See, e.g.*, FAC ¶¶ 9-10, 45-46. While it is true that a group of buyers can commit per se illegal price fixing by forming a buyers' cartel, the Complaint does not plausibly suggest a buyers' cartel here. "The important economic difference between efficient joint purchasing and harmful buyer collusion [i.e., a buyers' cartel] is that the former is an output-increasing activity while the latter reduces output." Areeda § 2012b. The Complaint does not allege buy-side price-fixing because it does not allege the network rental agreements reduce output in any way. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (the antitrust injury from a buyers' cartel is "suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices") (quoting Areeda § 375b at 297 (1995 ed.) (emphasis added); Areeda § 2012 ("Significantly, a buyers' cartel must be concerned about suppressing the amount of its purchases, just as a sellers' cartel is concerned about suppressing its output.").

Indeed, the First Circuit reviewed a nearly identical set of PBM network agreements and similarly concluded they did not constitute a per se antitrust violation. *See Stop & Shop*, 373 F.3d at 62. In *Stop & Shop*, two PBMs, PharmaCare and Provider, entered into two agreements that allowed each PBM's respective insurer customers to use the other PBM's pharmacy networks. *Id.* at 59. The district court dismissed the argument that this agreement was per se illegal, and the First Circuit affirmed, holding: "These are undoubtedly horizontal agreements . . . . But on their face, they are not exclusionary or otherwise anti-competitive: they allow more pharmacies to compete for the same consumer's business . . . and give customers more options." *Id.* at 62 (emphasis omitted). The same is true here.

### 2. The network rental agreements do not violate the rule of reason.

Because Plaintiffs do not plausibly allege a per se violation, their claims must be assessed under the rule of reason. *Flaa*, 55 F.4th at 693. Under the rule of reason, the "threshold step . . . is to accurately define the relevant market." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023). Then, Plaintiffs must plausibly allege that "the challenged restraint has a substantial

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 15

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

anticompetitive effect that harms consumers in the relevant market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) (quoting *Am. Express*, 585 U.S. at 541). Plaintiffs can make this showing directly or indirectly. *Id.* "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Intel Corp. v. Fortress Inv. Grp. LLC*, 2022 WL 16756364, at *2 (9th Cir. Nov. 8, 2022). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*, 585 U.S. at 542. The Complaint fails each of these requirements.

### a. Plaintiffs allege facially implausible relevant markets.

Failure to "plead a facially sustainable market definition" requires dismissal. *Flaa*, 55 F.4th at 687. And "a plaintiff can plead itself out of court by alleging facts that are inconsistent with its claim." *Id.* at 692. Here, the Complaint alleges facts that show the alleged "PBM Network Market" is a two-sided market, but the Complaint defines it as a one-sided market.

Two-sided antitrust markets are common when the product or service at issue facilitates a transaction between two parties. *See, e.g.*, *Am. Express*, 585 U.S. at 541; *Coronavirus Rep.*, 85 F.4th at 955-56; *Epic Games*, 67 F.4th at 1001-02. Credit card networks are the archetypal two-sided market. *See Am. Express*, 585 U.S. at 533-37. Credit card companies contract with merchants to create credit card networks and, using these networks, credit card companies then facilitate transactions between merchants and credit cardholders, thereby serving both sides of the transaction. *Id.* For cardholders, the network extends them credit, which allows them to make purchases without cash and to defer payment until later. *Id.* For merchants, the network allows them to avoid the cost of processing transactions and offers them quick, guaranteed payment, which saves merchants the trouble and risk of extending credit to customers. *Id.* By providing services to both sets of parties to facilitate the transaction between them, credit card networks "operate what economists call a 'two-sided platform.'" *Id.* at 534. Because of this economic reality, the Supreme Court held that "competition cannot be accurately assessed by looking at only one

1    side of the platform in isolation." *Id.* at 546. Rather, the plaintiff had to "demonstrate

2    anticompetitive effects on the two-sided credit-card market as a whole." *Id.* at 547.

3         As alleged in the Complaint, PBMs' pharmacy networks are two-sided transaction

4    platforms, just like credit card networks. Just as credit card companies must create networks of

5    participating merchants, PBMs must create networks of participating pharmacies. *See* FAC ¶ 3.

6    Like credit card companies, PBMs facilitate a single transaction between two other parties: the

7    health plan and the pharmacy. *Id.* ¶¶ 2-4; *see also Rutledge*, 592 U.S. at 83-84. Like credit

8    companies, PBMs contract with both parties to the transaction (*i.e.*, health plans and pharmacies)

9    to facilitate that sale. FAC ¶ 3. Like credit card companies, PBMs pay the merchant (pharmacy)

10   immediately and charge the customer (health plan) later, which allows the pharmacy to avoid the

11   cost of processing transactions, receive quick, guaranteed payment, and saves the trouble and risk

12   of extending credit. *See id.* ¶¶ 33-35; *see also Rutledge*, 592 U.S. at 83-84. And, accordingly,

13   PBMs, like credit cards networks, charge both sides of their platform fees for facilitating the

14   transaction between them. *See* FAC ¶¶ 3, 34.

15        The Complaint asserts that the relevant market is a "PBM Network Market" that ignores

16   the two-sided nature of the transaction facilitated by PBMs between health plans and pharmacies.

17   Crucially, PBMs cannot provide services to pharmacies without simultaneously providing related

18   services to health plans. *See id* ¶¶ 3-4, 67. Instead, Plaintiffs' market definition focuses exclusively

19   on the services provided by PBMs to pharmacies, defining a "market for access to fill PBM-

20   covered patient prescriptions and for related services." *Id.* ¶ 72. But the Complaint does not allege

21   any facts that tend to show the so-called "PBM Network Market" is a relevant market, *i.e.*, that it

22   represents "the field in which meaningful competition is said to exist." *See Coronavirus Rep.*, 85

23   F.4th at 955 (quotation marks omitted).

24        Because Plaintiffs fail to define a two-sided market, they ignore the effect of network rental

25   agreements on health plans. And because they do not account for the effect of network rental

26   agreements on health plans, the Complaint treats the lower prices that consumers have received as

27   antitrust damages. *See, e.g.*, FAC ¶ 97 ("The Agreement misallocates economic resources by

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 17

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

artificially deflating Reimbursement Rates and artificially inflating Fees for the Class members on Prime transactions."). This is the antithesis of antitrust law. "[T]he Supreme Court has instructed that, because of the benefits that flow to consumers from discounted prices, price cutting is a practice the antitrust laws aim to promote." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 896 (9th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, (1986)). "Consistent with that principle, [courts] should not be too quick to condemn price-reducing [conduct] as anticompetitive, lest we end up with a rule that discourages legitimate price competition." *See id.*

Because Plaintiffs' proposed market definition is facially implausible and was contrived to ignore the pro-competitive benefits of lower prices received by consumers, it is not well-pleaded. This is "fatal" to Plaintiffs' claims because "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Coronavirus Rep.*, 85 F.4th at 955 (quoting *Am. Express*, 585 U.S. at 543) (cleaned up).

### b. Plaintiffs fail to allege indirect anticompetitive effects and market power.

Plaintiffs also fail to plausibly allege that the network rental agreements in question had a "substantial anticompetitive effect" on that market. *Intel*, 2022 WL 16756365, at *2 (quoting *Am. Express*, 585 US at 541). To satisfy this requirement using indirect evidence, Plaintiffs must plausibly allege that Express Scripts had "market power." *Flaa*, 55 F.4th at 693. "A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint." *Id.* (quoting *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008)).

Market power is "the power to control prices or exclude competition." *Id.* (quoting *Paladin*, 328 F.3d at 1158) (citing Areeda § 2211c (2019 ed.)). While Plaintiffs make many conclusory allegations about market power, *see, e.g.*, FAC ¶¶ 78-79, 99, such labels hold no weight. *See Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 644 (9th Cir. 2014), as amended (Jan. 26, 2015) ("Plaintiff's pleading burden cannot be discharged by '[a] pleading that offers labels and

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 18

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

conclusions or a formulaic recitation of the elements of a cause of action . . . .'") (quoting *Iqbal*, 556 U.S. at 678).

Moreover, the factual allegations of the Complaint confirm that Express Scripts does not have market power. First, Express Scripts is incapable of excluding competition. The Complaint alleges that Express Scripts is one of at least six different large PBMs. FAC ¶ 5. The presence of "many market participants suggests that there is robust competition." *Flaa*, 55 F.4th at 694.

Second, Plaintiffs allege that Express Scripts has—at most—a 38% market share, which is insufficient to establish market power. FAC ¶ 39. "Courts generally require a 65% market share to establish a prima facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). Courts thus routinely dismiss claims for failure to plausibly allege market power where the alleged market share is greater than 50%—much higher than here. *See, e.g.*, *Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc.*, 399 F. Supp. 3d 1018, 1028-29 (C.D. Cal. 2019). The lowest market share the Ninth Circuit has been willing to find constitutes evidence of market power is 44%—still higher than in this case—and such a low market share was found sufficient only in the circumstances "where barriers to entry were high and competitors could not expand their short-run output." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir. 2021). Plaintiffs do not allege those circumstances here. *See also Park Irmat*, 911 F.3d at 517 (affirming dismissal of a Section 2 claim against Express Scripts brought by a pharmacy plaintiff because "the customers of [plaintiff's] proposed market-health insurance plans-are free to choose other PBMs or independent pharmacies that offer mail-order pharmacy services.").

Express Scripts' "lack of market power is fatal to the [Plaintiffs'] claims under the rule of reason." *See Flaa*, 55 F.4th at 695.

### c. Plaintiffs do not plausibly allege direct evidence of substantial anticompetitive effect.

Plaintiffs are left with only one remaining path to avoid dismissal: alleging facts that plausibly establish direct evidence of substantial anticompetitive effect. "Direct evidence of

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 19

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Intel*, 2022 WL 16756365, at *2 (quoting *Am. Express*, 585 U.S. at 542). This is another dead end.

First, because of their faulty market definition, Plaintiffs do not even attempt to show anticompetitive effects on the relevant two-sided "market as a whole." *See* Section III.B.2.a., above. That would have required alleging facts showing that the network rental agreements "increased the cost of [PBM] transactions above a competitive level," "reduced the number of [PBM] transactions, or otherwise stifled competition in the [PBM] market," accounting for such effects on ***both*** pharmacies and health plans. *See Am. Express*, 585 U.S. at 547. Plaintiffs do not allege that. They instead allege only that pharmacies—one side of the two-sided market—were harmed by the network rental agreements. *See, e.g.*, FAC ¶¶ 6, 14. That is the same flaw that doomed the case in *American Express*: Plaintiffs "wrongly focuse[d] on only one side of the two-sided . . . market." 585 U.S. at 547. It similarly required dismissal in *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *14 (N.D. Cal. Nov. 30, 2021) ("Failure to allege injury that harmed overall competition in the relevant market—here, a two-sided market of transactions—undermines Plaintiffs' theory of antitrust injury."), *aff'd*, 85 F.4th 948, 955 (9th Cir. 2023).

The Complaint also erroneously assumes that any increase in transaction fees charged to pharmacies is a supracompetitive price and not the result of other market factors. But "[e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power." *Am. Express*, 585 U.S. at 547. And Plaintiffs ignore the obvious benefit to health plans and patients—billions of dollars of savings—from PBMs using the network rental agreements. *See, e.g.*, Ex. A, Part 3. It also ignores the benefits that pharmacies receive, as they now get access to more customers through a single PBM network. *See Stop & Shop*, 373 F.3d at 59 (explaining how similar PBM network rental agreements were "on their face, . . . not exclusionary or otherwise anti-competitive: they allow *more* pharmacies to compete for the same consumer's business . . . and give customers *more* options."). Because "the occurrence of a price increase does not in itself permit a rational inference of supracompetitive pricing," a

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 20

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

plaintiff "must allege that a price increase is traceable to a restraint on trade." *Intel*, 2022 WL 16756365, at \*2 (cleaned up). The Complaint does not do that. In fact, the Complaint does not even allege prices across the two-sided market actually increased on balance. The Complaint does not rule out that savings to health plans from network rental agreements (through lower rates) may have been larger than the increase in fees paid by the pharmacies. Thus, the Complaint is consistent with a scenario where the effect of the network rental agreements on the two-sided PBM market as whole was a net price reduction.

Finally, the Complaint does not allege any facts that suggest the network rental agreements reduced output or quality. The Complaint uses the word "output" only four times, with each reference being nothing more than a conclusory statement that output has been "suppressed" or "reduced." FAC ¶¶ 63, 98, 106, 114. The same goes for the four conclusory allegations about reductions of quality. *Id.* The Complaint contains no factual allegations that fewer prescriptions are being filled, that fewer health plans or pharmacies are buying PBM services, that any measure of market-wide output has gone down, or that pharmacy or PBM services are somehow worse than before. Plaintiffs' "few conclusory allegations, unsupported by any facts, are insufficient to plead output restriction" or quality reduction. *See Intel*, 2022 WL 16756365, at \*3 (citing *Twombly*, 550 U.S. at 555-56).

In sum, the Complaint seeks damages for procompetitive conduct that saves consumers money, but cuts into Plaintiffs' profits. That is not a plausible claim for relief under Section 1 of the Sherman Act. *See Intel*, 2022 WL 16756365, at \*2.

**IV.    Plaintiffs do not state a plausible claim for relief against Evernorth.**

Defendant Evernorth is the parent entity of its subsidiary, Express Scripts. FAC ¶ 28. "[I]t is well established that a parent-subsidiary relationship by itself is insufficient to impute liability." *Prudencio v. Midway Importing, Inc.*, 831 F. App'x 808, 810 (9th Cir. Oct. 26, 2020) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). The sole allegation in the Complaint pertaining to Evernorth's conduct is that it "actively participates in . . . shaping the company policies at issue and . . . crafting, approving, and implementing the unlawful conduct." FAC ¶ 29. This does not state a plausible claim for relief against Evernorth. *See Prudencio*, 831 F. App'x at 810-11; *see*

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 21

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

*also In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *10-12 (D. Minn. Apr. 5, 2022) (dismissing claims against parent Express Scripts Holding Co., n/k/a Evernorth, for alleged conduct by its subsidiary, Express Scripts); *whiteCryption Corp. v. Arxan Techs., Inc.*, 2015 WL 3799585, at *3 (N.D. Cal. June 18, 2015) (dismissing claims against parent where only allegations were that it was "involved in many of the communications surrounding the formation" of its subsidiary's challenged contract). Evernorth should also be dismissed as an individual defendant on this basis.

## CONCLUSION

For these reasons, Express Scripts respectfully requests that the Court (1) transfer the case to the Eastern District of Missouri, or (2) dismiss the Complaint in its entirety, or (3) strike the class action allegations and (4) dismiss the claims against the parent company Evernorth.

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 22

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

Dated: April 22, 2024

Respectfully submitted,


By: */s/ Alicia Cobb*
Alicia Cobb, WSBA #48685
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1109 First Avenue,
Suite 210
Seattle, WA 98101
Tel: (206) 905 7000
Fax: (206) 905 7100
aliciacobb@quinnemanuel.com

Michael Lyle (pro hac vice)
Jonathan G. Cooper (pro hac vice)
Michael D. Bonanno (pro hac vice)
Ryan T. Andrews (pro hac vice)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
mikelyle@quinnemanuel.com
jonathancooper@quinnemanuel.com
mikebonanno@quinnemanuel.com
ryanandrews@quinnemanuel.com

*Attorneys for Defendants*

Motion to Transfer, Dismiss, or Strike
(Case No. 2:24-cv-00039-RAJ) – 23

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

**LCR 7 CERTIFICATION**

I certify that this memorandum contains 8,005 words, in compliance with the 8,400 word limit set forth in Local Civil Rule 7.


DATED: April 22, 2024



/s/ Alicia Cobb
Alicia Cobb, WSBA #48685

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 24

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a copy of the foregoing to all counsel of record.

DATED: April 22, 2024

*/s/ Alicia Cobb*
Alicia Cobb, WSBA #48685

MOTION TO TRANSFER, DISMISS, OR STRIKE
(Case No. 2:24-cv-00039-RAJ) – 25

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000