HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OSTERHAUS PHARMACY, INC., *et al.*,

    Plaintiffs,

vs.

EXPRESS SCRIPTS, INC., *et al.*,

    Defendants.

Case No. 24-cv-0039-RAJ

**ORDER**

## I.    INTRODUCTION

THIS MATTER is before the Court on Defendant Express Scripts, Inc. and Defendant Evernorth Health's s Motion to Transfer or in the Alternative Dismiss or Strike the Complaint ("Defendants' Motion"). Dkt. # 77. Plaintiffs oppose transfer and dismissal. Dkt. # 82. Defendants request oral argument, but the Court finds it unnecessary. For the reasons stated below, the Court GRANTS in part and DENIES in part Defendants' Motion. Dkt. # 77.

ORDER – 1

## II.    BACKGROUND

### A.    Procedural Background

Plaintiffs brought this class action lawsuit in the Western District of Washington against Express Scripts Inc. ("ESI") and its parent company, Evernorth Health Inc. (collectively, "Defendants"). Dkt. # 1. Plaintiffs filed the First Amended Complaint ("FAC") in this matter on March 1, 2024. Dkt. # 46. Defendants' Motion was filed thereafter, and the parties completed the briefing on this motion on July 22, 2024. Plaintiffs filed a Notice of Supplemental Authority on January 24, 2025, Dkt. # 84, and Defendants filed a response, Dkt. # 85, on February 3, 2025.[1]

### B.    Factual Background

Plaintiffs, a group of pharmacies, challenge agreements that Defendant ESI, a large pharmacy benefit manager ("PBM"), made with each of the alleged Co-Conspirators. The Co-Conspirators are three smaller PBMs, Prime, Benecard, and Magellan. Plaintiffs assert that agreements constitute a horizontal price-fixing scheme in violation of the Shearman Act. The Court summarizes the allegations below.

The Complaint states that three PBMs, ESI, CVS Caremark, and OptumRx, control more than 80% of the prescriptions filled in the United States, which means pharmacies must contract with these three PBMs in order to effectively serve their patients. Dkt. # 46 ¶¶ 5–7. Smaller PBMs, such as the Co-Conspirators, have substantially less market share than the three aforementioned PBMs, and have ordinarily and historically offered pharmacies more favorable and competitive reimbursement rates and fees. *Id*. ¶¶ 10–12.

---

[1] The Court does not reference or rely on this supplemental authority in resolving this motion.

ORDER – 2

  Plaintiffs identify three of ESI's contracts with each Co-Conspirator, as horizontal price-fixing agreements. Plaintiffs allege that each agreememt fixes the Co-Conspirator's reimbursement rates and fees in accordance with ESI's rates and fees schedule, effectively "renting" ESI's market power. *See id*. ¶¶ 40–70. ESI's agreements with Co-Conspirators, Prime, Benecard, and Magellan, took effect in 2020, 2022, and 2023, respectively. *See id*. ¶ 19, 55, 58.

  The Complaint indicates that the network rental agreements[2] only function to set these rates. The only participation by ESI in the process is to add an ESI network identifier to the computer system so that the ESI reimbursement rates and fees will be imposed on the pharmacies and Co-Conspirators' transactions. *See id*. ¶ 52–54, 57, 60. Plaintiffs allege ESI and Co-Conspirators operate independently and have not integrated any business functions. *See id*. ¶ 15, 57, 60.

  Plaintiffs allege that the network rental agreements "impair free market forces that would otherwise determine [] the prices." Dkt. # 46 ¶ 62. They allege the agreements have an anticompetitive effect because they result in pharmacies receiving lower reimbursement rate and paying higher transaction fees to the Co-Conspirators than they would without the agreements. *See id.* Plaintiffs allege that Co-Conspirators and ESI share these supercompetitive profits. *See id*. ¶¶ 14, 45, 51, 56, 59. Plaintiffs allege that the agreements have the effect of "reducing consumer choice, suppressing the output of pharmacy services, and decreasing the quality of pharmacy services, all without any offsetting procompetitive benefits." *Id*. ¶ 62.

---

[2] Defendants do not dispute the existence of the agreements and use the term "network rental agreements" throughout the briefing. *See generally* Dkts. # 77, 83. When the Court refers to the "network rental agreements" it refers to the agreements Plaintiffs allege to be the anticompetitive agreements at the heart of this antitrust dispute.

ORDER – 3

### III. LEGAL STANDARDS

#### A. Motion to Dismiss

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 167 L.Ed.2d 929 (2007). In the context of a motion under Rule 12(b)(6), the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). Courts are not required "to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

#### B. Motion to Transfer

Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." The purpose of § 1404 is to prevent wasted time, energy, and money and to protect litigants, witnesses, and the public from unnecessary inconvenience and expense. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

A valid forum selection clause may be enforced via a motion to transfer brought under § 1404(a). *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Id.* at 62. When a valid forum selection clause exists, only "extraordinary circumstances unrelated to the convenience of the parties" justify denying a § 1404(a) motion. *Id.*

ORDER – 4

## IV. DISCUSSION
### A. Transfer

Defendants argue that Plaintiffs' claims are subject to a forum-selection clause pursuant to their Pharmacy Provider Agreements with ESI. Dkt. # 77 at 13. Plaintiffs do not dispute the validity of the of the forum-selection clause, rather they argue that the claims in this matter fall outside the scope of the provision in the agreements. *See* Dkt. # 82 at 4–8. In opposing transfer, Plaintiffs cite to *CZ Servs., Inc. v. Express Scripts Holding Co.*, No. 18-cv-04217, 2018 WL 3972030, at *2 (N.D. Cal. Aug. 20, 2018) ("*CZ Services*"). *See id*. Although Defendants acknowledge that the case "involve[es] the same forum-selection clause," Defendants contend the circumstances are distinguishable. *See* Dkt. # 83 at 3.

The relevant agreements between each Plaintiff and Express Scripts contains a nearly identical "Dispute Resolution" provision that includes a forum-selection clause. Plaintiff Osterhaus Pharmacy's Provider Agreement provides that:

> Except as provided herein, prior to either party taking any legal action in connection with this Agreement, both parties agree to meet in good faith to resolve any claim or controversy ("Claim"). Whether under federal or state statutory or common law, brought by either ESI or the Provider against the other, or against the employee, members, agents or assigns of the other, arising from or relating in any way to the interpretation or performance of this Agreement . . .  All litigation between the parties ***arising out of or related in any way to the interpretation or performance <u>of the Agreement</u>*** shall be litigated in the U.S. District Court for the Eastern District of Missouri, or as to those lawsuits which the Court lacks jurisdiction, before a court located in St. Louis County Missouri.  The parties agree that Claims shall not be consolidated or coordinated in any action with the Claim of any other individual or entity. No Claim or other dispute may be litigated on a coordinated, class, mass, or consolidated basis.

Dkt. # 78-2 at 4 (emphasis added).

A forum-selection clause is properly enforced through 28 U.S.C. § 1404(a), which codifies the doctrine of *forum non conveniens* "for the subset of cases in which the transferee forum is within the federal court system." *Atl. Marine*, 571 U.S. at 60; *see also* 28 U.S.C. § 1404(a). Section 1404(a) provides that, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any

ORDER – 5

other district . . . where it may have been brought or to any district . . . to which all parties have consented." 28 U.S.C. § 1404(a). Typically, a forum-selection clause is enforced upon a motion to transfer. *See, e.g., Atl. Marine*, 571 U.S. at 59.

Forum-selection clauses "can be equally applicable to contractual and tort causes of action." *Manetti–Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988). Forum-selection clauses do not apply to any and all litigation between the parties. *See In re Orange, S.A.*, 818 F.3d 956, 962 (9th Cir. 2016). They apply only to the claims in that will require the interpretation of the agreements, or a determination of whether the parties complied with their terms. *Id*. at 963.

Where, for example, the clause governs claims "arising under" the particular agreement that contains the forum selection clause, it "should be interpreted narrowly," *i.e.*, as applying only to those disputes "relating to the interpretation and performance of the contract itself." *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011) (quoting *Mediterranean Enters., Inc. v. Ssangyong Corp*., 708 F.2d 1458, 1464 (9th Cir. 1983). By contrast, a clause that provides that all disputes "arising out of or relating to" or "in connection with" an agreement shall be adjudicated in a specified forum is broader. *See id.*

In *CZ Services*, a Northern District of California court found that a forum-selection clause, the same clause at issue here, did not apply to Plaintiffs' defamation claims. The court stated: "The determinative question is whether the [] claims will require the Court or the trier of fact to make any findings about the adequacy of the parties' performance under the provider agreements." Defendants contend that the court in *CZ Services* found that the defamation claims fell outside of the forum-selection clause because the claims would "stand or fall without any reference to the agreement." Dkt. # 83 at 8. Further, Defendants assert this Court should enforce the clause because "Plaintiffs' Complaint is built on express references to the rates, fees, and pricing schedules set out in the Agreements." *Id*.

ORDER – 6

Defendants attempt to distinguish *CZ Services* is unavailing. Although the language of the clause signals that it should be interpreted broadly, the clause itself is inapplicable because Plaintiffs are not disputing ESI's reimbursement rates and fees with the pharmacies. At most, the claims concern Plaintiffs' agreements with Co-Conspirators, non-parties in this action. These agreements are separate and unrelated to ESI's Pharmacy Provider Agreements with Plaintiffs. Thus, Plaintiffs' antitrust claims can be adjudicated without any reference to ESI's agreements, and the case can stay with this Court.

Defendants' argument regarding the class action claims fails for the same reasons that the Court discussed above. The class claims do not relate to the interpretation or performance of the Pharmacy Provider Agreements. The claims relate to ESI's conduct with Co-Conspirator PBMs, which Plaintiffs allege resulted in pharmacies paying inflated fees and recouping depressed reimbursements from the Co-Conspirator PBMs, not ESI. Therefore, the Court will not strike the class allegations.

**B.    Dismissal of Antitrust Claims**

Defendants argue that the Court should dismiss the Complaint because Plaintiffs fail to state an antitrust injury necessary for standing and fail to state a claim for which relief can be granted under Section 1 of the Sherman Act. *See generally* Dkts. # 77, 83.

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has held that while Section 1 prohibits every agreement "in restraint of trade," the Court "has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Under Section 1, a plaintiff must prove that (1) an agreement exists, (2) the agreement imposed an unreasonable restraint of trade through either a per se or rule of reason analysis, and (3) the restraint affected interstate commerce. *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996).

ORDER – 7

### 1.     Antitrust Injury

The Court first turns to whether Plaintiffs have plausibly asserted a cognizable antirust injury. Defendants argue that Plaintiffs failed to allege PBMs are economic "substitutes," and thus failed to establish an antitrust injury. *See* Dkt. # 83 at 11–12. Defendants also argue that Plaintiffs fail to establish an antitrust injury because the network rental agreements increased competition and allowed Co-Conspirator PBMs to offer lower drug prices. Dkt. # 77 at 11. As a result of the agreements, Defendants assert that consumers, health plans and those insured by health plans, benefit from reduced prices. *See id*.

To establish an antitrust injury, a plaintiff must show an injury "causally linked" to an alleged anti-competitive practice, and that the injury is one that "the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 109 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977)). Antitrust liability can arise from a horizontal conspiracy whereby a defendant agrees with others to fix prices "caus[ing] buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint." *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 988 (9th Cir. 2000); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 103 (3d Cir. 2010).

The caselaw Defendants use to support that Plaintiff must demonstrate that PBMs are substitutes is not analogous to the circumstances alleged in this matter. For example, in *Intel Corp. v. Fortress Inv. Grp. LLC*, the court dismissed claims in part for failure to adequately plead an antitrust injury. No. 19-cv-07651, 2020 WL 6390499, (N.D. Cal. July 15, 2020) ("*Intel Corp.*"). There, Apple and Intel Corporation, asserted antitrust claims against companies alleged to have aggregated a portfolio of "weak" patents that aggressively enforced those patents through infringement actions. *See id*. at *1.

ORDER – 8

Essentially, the Complaint alleged that the aggregation of a broad array of patents stifles competition of electronic device suppliers and eliminates substitutes. *See id*. at *2. When analyzing the relevant market, the court noted that Plaintiffs failed to explain how patents for a smartphone a part of the same market as a refrigerator could be when the products are not substitutes themselves. *See id*. at *9. When analyzing whether an antitrust injury was present, the court concluded there was "was no clear injury it is not clear that those lawsuits came about *because of the elimination of substitutes*." *Id*. at *12 (emphasis in original).

The circumstances of *Intel Corp.* are patently distinguishable from this case. First, that case does not concern a horizontal price-fixing conspiracy. Second, the case involved a somewhat novel strategy to use antitrust law to challenge meritless patent litigation. Third, Plaintiffs in this case did not put substitutes at issue in their allegations. Accordingly, to the extent the Court need address "substitutes" or decide whether PBMs are "competitors" at this stage of litigation, the Court concludes that the description of the companies alleged in the Complaint and common sense indicate the PBMs are competitors and substitutes as they provide identical services to pharmacies.

Defendants also argue that the agreements benefit consumers, so pharmacies cannot base an antitrust injury on this basis. Dkt. # 77 at 18. However, these facts contradict the facts of the Complaint, which is improper on a motion to dismiss. Therefore, the Court will not dismiss on that basis.

The Court is satisfied that these agreements between ESI and Co-Conspirators, to share the large firm's market power, allowed Co-Conspirators to receive more favorable rates and reimbursements at the expense of Plaintiffs, and plausibly at the expense of consumers. Plaintiffs' injuries are "causally linked" because the injury stems from Co-Conspirators change of rates to match ESI's rates, that would not have prevailed in the free market absent the restraint of trade. Accordingly, the Court concludes Plaintiffs have established an antitrust injury.

ORDER – 9

### 1. § 1 Shearman Act

The Court now turns to whether Plaintiffs' assertions are sufficient to establish a plausible claim for relief under § 1 of the Shearman Act. Plaintiffs contend that the network rental agreements between ESI and each PBM Co-Conspirator constitute a per se violation of Section 1. Dkt. # 46 ¶¶ 40–70. Plaintiffs allege that these agreements are horizontal price-fixing agreements because after they were made, the Co-Conspirators uniformly changed their fees and reimbursement rates to match the higher rates that ESI has historically charged. Defendants do not dispute that horizontal price-fixing is considered per se unlawful. Rather, Defendants argue that PBMs are "effectively purchasing cooperatives," immune from per se antitrust scrutiny. *See* Dkt. # 77 at 19. In support of this argument Defendants do not refer to the facts as they are alleged in the Complaint, but, instead, they point to caselaw describing the function of PBMs. *See id.* at 19–21.

In analyzing the reasonableness of an agreement under Section 1, the Supreme Court has distinguished between agreements made between competitors (horizontal agreements) and agreements made up and down a supply chain, such as between a retailer and a manufacturer (vertical agreements). *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("*Musical Instruments*"). Horizontal agreements in which competitors fix prices, divide markets, or refuse to deal are per se violations of the Sherman Act. *Id.* "Once the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation." *Id.*

Plaintiffs must provide "plausible grounds to infer an agreement," *Twombly*, 550 U.S. at 556, 127, but they are not required to show that an agreement is probable or to "allege a fact pattern that tends to exclude the possibility of lawful, independent conduct," *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) (quoting *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012)). Evidence of concerted, rather than independent, action among market competitors can include direct evidence of horizontal

ORDER – 10

agreements between competitors, *Musical Instruments*, 798 F.3d at 1193, the acceptance of an invitation to participate in a common scheme that restrains trade, *Interstate Cir. v. United States*, 306 U.S. 208, 227(1939); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022), or the existence of parallel conduct coupled with some further factual circumstance pointing towards a meeting of the minds, *Musical Instruments*, 798 F.3d at 1194.

A per se analysis applies when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Am. Ad. Mgmt. Inc.*, 92 F.3d at 784. "Per se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). The Supreme Court has held that "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223). To justify a per se prohibition, a restraint must have "manifestly anticompetitive" effects. *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977). Horizontal price-fixing is "ordinarily condemned as unreasonable per se" and is "'perhaps the paradigm of an unreasonable restraint of trade.'" *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1014 (N.D. Cal. 2008) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984)).

The existence of these network rental agreements is alleged in the Complaint and does not appear to be disputed by Defendants. *See generally* Dkts. # 46, 77, 83. The Court accepts Plaintiffs allegations as true and finds that Plaintiffs have sufficiently demonstrated that ESI and the Co-Conspirators had a contract which is clearly sufficient for the Court to plausibly infer an agreement.

ORDER – 11

Despite the existence of the agreements, Defendants argue ESI and Co-Conspirators are joint purchasers rather than competitors and thus are not subject to per se antitrust scrutiny. Much of the caselaw cited by Defendants in support of this argument had a different procedural posture than this matter. *See, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004) (reviewing a district court's grant of summary judgment for plaintiffs' per se claims under Section 1 of the Shearman Act against PBMs and insurers); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 966 (10th Cir. 2022) (discussing role of PBMs in affirming a district court's grant of summary judgment in favor of defendants for claims brought by pharmaceutical companies under Section 2 of the Shearman Act); *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *4 (E.D. Pa. Jan. 18, 2017) (characterizing PBM administration as achieving "a number of efficiencies" in years-long litigation in ruling on *Daubert* motions for pending class certification). In those cases, the cases had developed facts where it was appropriate for a court to look beyond the Complaint. Further, it does not follow from the fact that PBMs act as joint purchasers in one context that PBMs act as joint purchasers in every context. The Court declines to adopt factual determinations made in other PBM antitrust disputes that had different allegations and parties to support the conclusion that PBMs are purchasing cooperatives rather than competitors in this context.[3]

Further, "[t]he [cooperative buying defense] should generally be rejected where there is no integration of agency services, negotiation, contracting, or delivery, but that the firms have simply agreed on a price." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 2012b (2022 ed.). The Complaint indicates that the network rental agreements have not generated any efficiencies or integration and the only joint activity is price-fixing. *See* Dkt. # 46 ¶¶ 52–54, 57, 60.

---

[3] For the reasons discussed in Section IV.B.1 *supra*, it is plausible that PBMs are competitors.

ORDER – 12

1  The Complaint references a Prime executive's interview that indicates ESI and Co-Conspirator, Prime act independently. *See id*. ¶ 52–54. Defendants ask the Court to look at the interview in its entirety to demonstrate that achieved cost saving measures for clients. *See* Dkt. # 83 at 13; *see also* Dkt. # 78-1. However, looking at the interview, it neither conclusively proves that any savings were passed off to consumers, nor does it demonstrate that there was any integration that would refute per se antitrust scrutiny. Considering Defendants' dispute of the facts in the Complaint and the procedural posture of this case, it would be inappropriate for the Court to consider Defendants' characterization of ESI as a "joint purchaser" rather than a direct competitor at this stage of the litigation.[4]

The Complaint plausibly alleges that the network rental agreements are a horizontal price-fixing scheme. The Complaint demonstrates that ESI and Co-Conspirators matched their rates and fees after they entered into the network rental agreements and ESI and Co-Conspirators provide the same services to pharmacies. These allegations, taken as true plausibly indicate a price-fixing scheme that is an unreasonable restraint of trade that antitrust laws forbid.

Accordingly, Plaintiffs have met the burdens of asserting a per se antitrust violation for horizontal price-fixing. Therefore, the Court will not dismiss Plaintiffs' antitrust claims under §1 of the Shearman Act at this time. The Court notes that it need not separately analyze Plaintiffs claims under the rule of reason at this time as it concludes Plaintiffs properly pleaded a Section 1 claim.[5] However, if Plaintiffs cannot prove a per se violation later in this litigation, they may proceed with their claims under the rule of reason.

---

[4] Simply because a group of businesses label a structure as "joint purchasers" does not mean that the Court has to accept that as fact on a motion to dismiss. The facts in the Complaint plausibly indicate that PBMs may be viewed as horizontal competitors, with respect to their business practices with pharmacies.

[5] On a Rule 12(b)(6) motion "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563; *see also Snell v. G4S Secure Sols. (USA) Inc.*, 424 F. Supp. 3d 892, 904 (E.D. Cal. 2019) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." (internal citation and quotation omitted)); *Fairhaven Health, LLC v. BioOrigyn, LLC*, No. 19-cv-01860-RAJ, 2021 WL 5987023, at *4 (W.D. Wash. Dec. 17, 2021) (same). Because Plaintiffs here

ORDER – 13

### C. Claims Against Evernorth

Plaintiffs allege Defendant Evernorth "actively participate[d] in the unlawful conduct [by] among other things, shaping the company policies at issue and participating in crafting, approving, and implementing the unlawful conduct." Dkt. # 46 ¶ 29. This is the only allegation of Evernorth's conduct in the Complaint. *See generally id.* Defendants ask the Court to dismiss Defendant Evernorth, the parent corporation of ESI, arguing the parent-subsidiary relationship is insufficient to impute liability. *See* Dkt. # 77 at 27–28.

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.'" *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted). Activities such as "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *Id.* at 72. However, the parent is liable if "'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of.'" *Id.* at 64 (citation omitted). At the pleading stage, a plaintiff asserting parent-company liability should offer "allegations regarding how [the parent's] control over [the subsidiary's] actions might have been effected[.]" *Off. Cantonal des Faillites de la Republique et du Canton de Geneve v. Expedia, Inc.*, No. 23-cv-983-BJR, 2024 WL 381181, at *4 (W.D. Wash. Feb. 1, 2024).

---

have adequately alleged a per se violation of Section One of the Sherman Act, the Court need not determine whether they have alleged unreasonableness under the rule of reason. *See Duffy v. Yardi Sys., Inc.*, No. 23-cv-01391-RSL, —– F.Supp.3d ——, ——, 2024 WL 4980771, at *7 (W.D. Wash. Dec. 4, 2024) ("Because plaintiffs have alleged a per se violation of § 1 of the Sherman Act, the Court need not determine whether plaintiffs have also alleged unreasonableness under the rule of reason."); *see also PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158 1178 ("A Section 1 plaintiff must sufficiently plead a restraint of trade that falls under one of three rules of analysis: rule of reason, per se, or quick look. While courts typically need not decide which standard to apply at the pleading stage, they must still determine whether the complaint has alleged sufficient facts to state a claim under at least one of these three rules."); *Zulily, LLC v. Amazon.com, Inc.*, No. 23-cv-01900-JHC, 2024 WL 5262903, at *13 (W.D. Wash. Dec. 31, 2024) (analyzing antitrust claims only under the rule of reason and declining to analyze whether Plaintiffs adequately alleged a per se violation of Section 1).

ORDER – 14

Plaintiffs' allegations, as currently in the Complaint lack sufficient factual detail to support that Evernorth is liable as a parent corporation of ESI. Here, the Complaint contains a single bare assertion about Evernorth's role in the alleged wrong. This allegation is insufficient to trace the anticompetitive conduct to Evernorth to show the parent corporation was a direct participant. Therefore, the Court dismisses the claims against Evernorth without prejudice.

### D. Leave to Amend

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). It should be given absent "any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment etc." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1151–52 (9th Cir. 2016) (citations omitted). "In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017) (internal quotation omitted). Accordingly, Court grants Plaintiffs leave to file an amended complaint as to allegations against Defendant Evernorth.

ORDER – 15

## V. CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss. Dkt. # 77. The Court denies transfer of the case and dismissal of Plaintiffs claims with respect to Defendant Express Scripts, Inc. The Court GRANTS Plaintiffs leave until March 11, 2025, to file an amended complaint; such leave is limited to the allegations against Defendant Evernorth dismissed without prejudice against here.

Dated this 13th day of February, 2025.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER – 16